**J. A. MARKEL CO., Inc. v. D. L. STOKES & CO., Inc. et al.**

**No. 13794.**

United States Court of Appeals Fifth Circuit.

June 27, 1952.

Walter G. Cooper, A. Walton Nall, Atlanta, Ga., for appellant.

Thomas B. Branch, Jr., James A. Branch, Atlanta, Ga., for appellee.

Before HOLMES, BORAH and RIVES, Circuit Judges.

BORAH, Circuit Judge.

J. A. Markel Company, Inc., appellant, brought this suit against D. L. Stokes & Company, and D. L. Stokes, appellees, to recover damages for an alleged breach of contract.

The facts may be summarized as follows: In 1940 the parties to the contract, Markel Company, a broker of real estate mortgages, and D. L. Stokes & Company, a dealer in real estate mortgages, entered into negotiations for the purpose of effecting an arrangement whereby Stokes & Company would sell part of its mortgages through Markel. The arrangement was never formalized by a written contract covering all phases of the relationship but that portion of the agreement here in question is evidenced by the following correspondence: On July 18, 1941, in response to Markel's request for a letter from Stokes & Company agreeing not to sell direct to any customer to whom the broker might sell its mortgages, Stokes & Company wrote a letter to Markel agreeing not to do so without Markel's written consent. Thereafter, on August 4, 1941, Markel's president sent a letter to Stokes & Company which reads in part as follows: "I do not believe that we have the usual letter in our files from you agreeing to protect us and not sell to any

customer of ours to whom we may sell your mortgages or with whom we may be negotiating such a sale of which you are advised." In response, Stokes & Company pointed out that its letter of July 18, 1941, contained an agreement not to sell to any of Markel's customers. Following this correspondence, Stokes & Company sold large quantities of mortgages through this brokerage arrangement and on October 14, 1942 Markel advised Stokes & Company that certain of its mortgages on property located in Georgia had been sold to Berkshire Life Insurance Company. In setting forth the terms of the sale, Markel stated that it would be necessary for Stokes & Company to agree not to sell direct to Berkshire Life or any other Markel customer without its written consent. Stokes & Company agreed, and between October of 1942 and April of 1946 it sold large quantities of mortgages to Berkshire Life through the broker, Markel.

On April 3, 1946, Berkshire Life Insurance Company informed Markel that in the future it would purchase mortgages direct from the originators or the original mortgagees only and it would not make any more purchases through brokers. Since that time Berkshire Life has consistently adhered to its announced policy and has made purchases only through its mortgage loan correspondents or its mortgage servicing agents. On April 26, 1946, following Berkshire Life's announcement, Markel wrote to Stokes & Company, informing it of the change in policy. The letter stated that it did not wish to stand in the way of sales to Berkshire Life provided all conditions in connection with such sales were as equally profitable to both of them "as they would be to other sources," and requested Stokes & Company, before committing itself, to first inform Markel of any communications which might be received from Berkshire Life along this line. The trial court found that Stokes & Company did not answer the letter and never orally agreed to its terms.

Markel continued to sell mortgages for Stokes & Company but it did not make any effort to sell to Berkshire Life. Sometime during the latter part of 1946 Berkshire Life sought out Stokes & Company, appointed it a mortgage loan servicing agent, and thereafter purchased large quantities of real estate mortgages direct from Stokes & Company. On these direct sales to Berkshire Life, Stokes & Company disregarded Markel's letter of April 26, 1946, and did not pay Markel any commission fees thereon. Markel learned of the direct sales and in February, 1948, demanded payment of its commission but the demand was refused and this suit followed.

The trial court found that the letters passing between the parties and their oral negotiations did not contemplate that if a customer introduced to Stokes & Company by Markel should cease to be Markel's customer that Stokes & Company could never thereafter at any time deal direct with the broker's former customer; and that the parties never agreed that Stokes & Company should never sell direct to any person or company to whom Markel had sold its mortgages after such person ceased to be a customer of the broker. The trial judge concluded that none of the letters or oral negotiations between the parties constituted such a contract as would preclude Stokes & Company from selling mortgages to Berkshire Life after the insurance company ceased to be Markel's customer. Accordingly, judgment was rendered in favor of the defendants and the plaintiff has appealed.

█ We agree with the trial court's conclusion that there was no contract between the parties precluding Stokes & Company from selling mortgages direct to Berkshire Life after the insurance company ceased to be one of Markel's customers. The letter of August 4, 1941, from Markel to Stokes & Company asks for an agreement "not to sell to *any customer of ours to whom we may sell your mortgages*."[1] Likewise the letter from Markel dated October 14, 1942 asked Stokes & Company to agree not to sell direct to "Berkshire *or any other customer*" of Markel. Moreover, the letters from Stokes & Company to Markel clearly indicate that the agreement entered into by

1. Emphases added throughout.

the parties referred to customers of Markel. In short, there is nothing in this correspondence to indicate that the restriction would apply to persons or companies after they ceased to be customers of Markel and we are of opinion that the clear and unequivocal language in the letter correspondence compels our conclusion that the parties intended that the restriction would extend only to customers of Markel so long as they remained its customers. Since it is undisputed that Berkshire Life ceased to be a customer of Markel prior to the time when Stokes & Company made the direct sales in question, it follows that Stokes & Company was free to make such sales to Berkshire Life without payment of commission fees to Markel.

We do not overlook the fact that in the letter of April 26, 1946, Markel indicated its view that Stokes & Company could not sell direct to Berkshire Life without payment of commission fees. But this belated, one-sided, interpretation of the 1941–42 agreement, which was written after Berkshire Life ceased to be Markel's customer, is at variance with our interpretation of the meaning of the contract theretofore entered into. Appellant contends that Stokes & Company, by its silence and passive acquiescence accepted the terms of the letter of April 26, 1946, as a novation or amendment to the 1941–42 contract. We think this attempt to modify the clear meaning of the prior agreement was but an offer which was never accepted by Stokes. See 1 Williston on Contracts § 91.

The judgment of the court below was right and it is affirmed.