OMAHA PAPER STOCK COMPANY, INC., Plaintiff,

v.

HARBOR INSURANCE COMPANY, Defendant.

Civ. No. 75–0–454.

United States District Court, D. Nebraska.

Jan. 11, 1978.

Clayton O. Byam, Omaha, Neb., for plaintiff.

Thomas Walsh, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This litigation results from a major fire which destroyed substantial stock and also damaged equipment and buildings of plaintiff, Omaha Paper Stock at 1401 Laird Street, Omaha, Nebraska. The different categories of types of damage were separately insured under different policies by different insurers. The insurance policy involved here was written by Harbor Insurance Company to cover the "use and occupancy" of the 1401 Laird Street plant. (This coverage has also been referred to as "business interruption" coverage.) Plaintiff's operations at the Laird Street plant were suspended from the time of the fire, April 20, 1975, until October 21, 1975, a total of 152 days. At issue is whether the suspension of operations at Laird Street is covered under the use and occupancy policy and if so, whether Harbor Insurance Company must pay the per diem rate for the full 152 days or for only a portion thereof.

The facts are these: plaintiff Omaha Paper Stock Company (hereafter OPS) processes waste paper for sale. It operates two plants in this city: the Laird Street plant which processes large quantities of low-grade papers and a plant at 18th Street which processes higher grades of paper and requires more personal handling in the operations than does the Laird Street plant.

Prior to the fire, the paper market became severely depressed. As a result, OPS decided to stockpile its waste paper until the market conditions changed for the better. At the time of the fire, OPS had approximately sixteen thousand tons of paper at the Laird Street plant. The fire in question destroyed the entire stock. Eight million gallons of water were required to extinguish the fire and as a direct result, the physical plant, aside from the ground surrounding the buildings, was flooded.

OPS was unable to operate the Laird Street plant until the grounds were cleared of debris and the equipment was back in working condition. The plant equipment consisted in part of a baling machine and several conveyor belts of various sizes which fed the paper into the baler. The conveyors were continuous belts that approached the baler from several directions. In the case of three of these conveyors, the lower half of the continuous belt moved in a pit which was below ground or floor level. During the time that the fire was being extinguished, these pits filled with water, thus submerging the metal belts and causing extensive rust and corrosion of the belts. In order for the plant to resume operation, the damage to the conveyor belts had to be remedied either by repair or replacement. On April 30, following the fire, the insurance adjusters for all companies insuring the various losses, General Adjustment Bureau (hereafter GAB), OPS personnel, the public adjuster hired by OPS (Mr. Conant) and the original installers of the equipment in question met to survey the damage. The installer's opinion was that the conveyor belts were beyond repair and should be replaced. He estimated that the conveyor belts could be delivered within twelve to fourteen weeks. GAB, through its engineer (Mr. Rogers) felt that the belts could be dismantled, cleaned, oiled and re-

paired. No decision to repair or replace was made at that point. During the next two weeks, GAB explored both the possibility of repair as well as of replacement, securing estimates for both.

By May 15, power had been restored to the building. GAB's engineer, accompanied by the OPS equipment service man, attempted to operate the conveyor belts to ascertain the extent of damage. Upon discovering that the rust was causing the belts to buckle on their tracks, the conveyor belts were shut off, having only operated for somewhere between half a minute to three minutes.

By letter of May 19, Economy Baler Company (hereafter Economy), one of the companies contacted, confirmed its offer of a delivery time of four to six weeks for new replacement conveyor belts. Economy also agreed to install the equipment. However, no order was placed at that time.

Approximately a week later, GAB authorized the replacement of the belts and instructed Robert Epstein, president of OPS, to place the order with Economy as per the earlier quotation stated in the letter sent by Economy to GAB. Epstein telephoned Economy and placed the order. It is unclear whether Epstein or his public adjuster Conant had seen the quotation confirmation at the time that Epstein referred to it in placing his order.

The belts arrived in Omaha on June 27, 1975. When they arrived OPS notified GAB of their arrival so that installation could proceed. However, Economy had forgotten about its role concerning the installation contract and had made no arrangements. On July 14, its installer, Edward Cavanaugh, Jr., arrived in Omaha, but without men or equipment, expecting OPS to provide both. OPS was unaware of its intended participation in the installation role and was unable to supply either manpower or equipment. Unable to begin work, Cavanaugh left the next day and did not return. GAB assumed the responsibility to provide another installer and asked Epstein to contact Charles Cook, the original installer of the equipment, to ascertain whether Cook could install the equipment. Cook agreed but only in light of pre-existing commitments to finish other jobs.

Cook arrived on July 23 to begin installation. In tearing down some of the machinery, it was then discovered that one of the drive shafts had been bent and needed replacement. Epstein ordered a replacement from Economy on July 26. A mistake was made in the order which was corrected on July 29. Cook worked the week of July 23 and was able to install one of the belts. On August 5, Cook discovered that the belt which had been installed thus far was a cleated belt as opposed to a non-cleated belt. A decision was made the next day by Cook, GAB and the public adjuster, Conant, to order replacement·sections for the belt. The order was placed with Economy on August 8, but Economy did not ship the belts until late September and they were received by OPS on September 30. Consequently, Cook was unable to replace that belt until after October 1.

The entire installation process by Cook covered two and a half months since his crew was interrupted from time to time with previous commitments. Cook worked July 23 through 25, August 12 through 15, August 19 through 22, September 22 through 27, and finally, October 6 through the 10th. The only delay caused by the mistaken order of the cleated belt was in the final five days in October since the belt did not arrive until September 30. The reason that Cook did not work between August 22 and September 19 was because Cook had other commitments to meet and was uncertain about who was responsible to pay for the installation in question. After the cleated belt sections had been replaced with non-cleated sections, the equipment was tested on October 10. After the conveyors were completely assembled, the serviceman for the plant equipment finished checking the baler itself so that it was in workable order. It was impossible to make final repairs on the baler and to test it until conveyors were in operation and could feed the baler itself.

The insurance policy in question provides $586,800 insurance on the "use and occupancy of all buildings and/or structures and/or machinery and/or equipment and/or raw stock or stock in process contained therein upon the premises owned and/or leased and/or occupied by the assured, and situated at 1401 Laird Street, Omaha, Nebraska . . . ." This insurance is subject *inter alia* to the following conditions:

> The conditions of this contract of insurance are that if the said buildings and/or structures and/or machinery and/or equipment and/or stock or stock in process contained therein shall be destroyed or damaged . . . so as to necessitate a total suspension of business then this insurance shall be liable at a rate of $3,260 per working day for such total suspension.

> If the property damage due to perils insured against results in partial suspension of business, then this insurance shall be liable for such portion of $3,260 per working day which the proportion of reduction in output bears to the total production which would, but for partial suspension, have been obtained during the period of partial suspension.

> It is a condition of this insurance that buildings, surplus machinery or duplicate parts thereof, equipment, raw stock or stock in process which may be owned, controlled or used by the Assured, shall in the event of loss be used to expedite the continuance or resumption of business.

[1] This policy is a "valued" policy and where the "bona fides of the transaction is not assailed, and neither fraud nor mistake is charged, the valuation is conclusive upon the parties as the amount which the assured is entitled to receive upon the happening of the condition of the policy." *Michael v. Prussian National Insurance Company*, 171 N.Y. 25, 63 N.E. 810 (1902). The first question that must be addressed in this case is whether the "happening of the condition" of the policy occurred.

The insurer, Harbor Insurance Company (hereafter Harbor) contends that under these policy provisions, OPS had "substantial 'buildings, surplus machinery or duplicate parts thereof, equipment, raw stock or stock in process' which it owned, controlled or used 'to expedite the continuation or resumption of its business' and that defendant (sic) in fact had no total suspension of business but conducted its business as usual during the entire period for which suspension is claimed." The building, surplus machinery and duplicate parts thereof to which Harbor refers include both the plant at 18th Street and a portable conveyor belt which Harbor claims could have been used to resume operations at the Laird Street plant. OPS contends that the policy provisions refer only to the suspension of business at 1401 Laird Street and do not incorporate the operations of 18th Street in the determination of partial or total suspension of business. OPS also contends that reference to surplus machinery, etc., refers only to the buildings and equipment available at Laird Street. In short, OPS seeks to limit the policy provisions to the Laird Street operations.

It cannot be disputed that operations at Laird Street were totally interrupted. What remains for analysis is whether the availability of production capacity at the 18th Street plant demonstrated by the increased production at that plant after the fire in any way affects the determination that total suspension had occurred under the terms of the policy. This Court finds that it does not.

Rules of statutory construction for insurance policies are applicable and helpful in this case. "It is a well-established rule that an insurance contract will be interpreted in accordance with the reasonable expectations of the insured at the time of the contract, and in case of doubt, the policy will be liberally construed in favor of the insured. (Citations omitted.)" *Neal v. St. Paul Fire & Marine Insurance Company*, 197 Neb. 718, 720, 250 N.W.2d 648, 650 (1977). In addition, "an insurance policy should be considered as any other contract and be given effect according to the ordinary sense of the terms used, and if they are clear, they will be applied according to

their plain and ordinary meaning. (Citation omitted.)" *Pettid v. Edwards*, 195 Neb. 713, 716, 240 N.W.2d 344, 346 (1976).

Several factors are important in this determination: first, the policy itself refers only to the Laird Street plant without mention of the 18th Street operation. The evidence shows that Harbor was aware of the 18th Street plant when the insurance coverage was established. However, there is no mention of the 18th Street plant in the policy itself. Secondly, the operations at the two plants are different: 18th Street processes high grades of paper by means of a conveyor system, but with substantial manual handling; Laird Street processes low grades of paper with little manual sorting. The 18th Street plant production increased substantially after the Laird Street fire: the record indicates that 18th Street began to process a small percentage of the total production of lower grades of paper (newspaper and corrigated paper) which had been processed at Laird Street. But there is also evidence that OPS, in order to maintain customers, continued to collect the lower grades of paper and paid to have the paper disposed of at the city dump. Thus, while it is true that the surplus production capacity at the 18th Street plant was utilized, that utilization was to enable OPS to maintain its customers during the period when the Laird Street plant was closed. That utilization of surplus production capacity did not and could not expedite the resumption or continuance of business at the Laird Street plant itself.

In *City Tailors, Ltd. v. Evans*, 126 L.T. N.S. 439 (1921), the English court interpreted a similar provision in an insurance contract covering a wholesale and retail clothier business. A fire destroyed the original factory and temporary premises were let at substantial expense to the business in order to continue production. The insurance company sought to decrease their per diem liability by considering the output from the temporary plant in determining the loss of business. Scrutton, Lord Judge, stated:

If the assured cannot by reasonable exertions produce an output at (the original factory) there is a total loss; to the extent to which, acting reasonably, his output at (the original factory) diminished, there is a partial loss. In other words, the subject matter of the insurance is limited locally; it is profits at (the original factory) derived from output at the (original factory). The insurance is on a business carried on at (the original factory), not elsewhere; and it is interruption of, or interference with, that business at (the original factory) by fire which causes the loss.

*Hartford Fire Insurance Co. v. Wilson & Toomer Fertilizer Co.*, 4 F.2d 835 (5th Cir. 1925), concerned business interruption insurance for a manufacturing facility. In that case the plaintiff had a use and occupancy insurance policy for its fertilizer factory. Following a fire in the plaintiff's plant, in an effort to diminish its loss, the plaintiff constructed a temporary building in which it continued to mix fertilizers rather than manufacturing the ingredients. In discounting the profits earned at the second temporary plant, the court stated:

Plaintiff did not continue in the same business in which it had been engaged before the fire. The manufacturers of fertilizers as theretofore conducted entirely ceased, and the plaintiff, by purchasing, instead of manufacturing, the ingredients of its fertilizers, engaged in a different kind of business, in an effort to diminish its own as well as defendant's loss. Defendant was not entitled to have the loss under the policy reduced, unless net profits were earned by the plaintiff. . . . If as contended by the defendant, there should be an adjustment in the proportion that the fertilizers bought and mixed by the plaintiff during the period of suspension of business bore to the full normal production of fertilizers manufactured and mixed during such period, even though no net profits were earned, then the policy would be of no value to an insured, because it would be possible, by multiplying temporary plants, to produce the full, normal output, although the cost might be prohibitive. We do not think the policy is open for such a construction.

The contract provision requiring that surplus machinery and buildings be utilized must be read in conjunction with the "total suspension of business" clause. In light of the rules of construction and the facts concerning the nature of this particular business operation, the Court interprets that clause to mean that the assured must use such buildings and machinery to expedite resumption or continuance of the business operation that was interrupted, in this case, production of low grades of paper at the Laird Street plant. The assured in the instant case decided to rebuild the Laird Street plant to its former capacity. Any surplus machinery or buildings that it had available should have been used to resume that operation. If, for instance, OPS owned replacement belts for its conveyor or an additional baler, OPS would be required to use that machinery to expedite the reopening of the plant. Whether surplus production capacity at another and different plant is used is irrelevant since the utilization of such capacity would have no effect on the resumption or continuation of the plant covered by the insurance policy. Surplus production capacity at another and different plant affects only the extension or enlargement of production at that other and different plant.

The conclusion that operations at another existing plant are not relevant to the insurance coverage is consistent with the logic underpinning cases where a plant, covered by such insurance, chooses not to reopen at the same location, but does reopen at a different location. In *Beautytuft, Inc. v. Factory Insurance Association*, 431 F.2d 1122 (6th Cir. 1970), a fire destroyed the factory of a copper manufacturer. The policy contained a theoretical replacement time for the computation of the loss. The company recommenced operations at a different plant within three and a half months, though the theoretical replacement time for the original plant would have been much longer. The Court held that:

> Although a substitute plant of potentially equivalent capacity was promptly obtained, appellees' actual losses as shown by the proof continued beyond that date;

and appellees were entitled to reimbursement for such losses for the term of the theoretical replacement period as provided by the contract.

The Court in *Beautytuft* did not consider the reopening date at the substitute plant as having any bearing on the length of replacement time at the premises insured.

Another case considering this point is *Hawkinson Tread Tire Service Co. v. Indiana Lumbermens Mutual Insurance Company of Indianapolis*, 362 Mo. 823, 245 S.W.2d 24 (1951). The insured in that case opened its operations in a new location after a fire destroyed the insured's premises. The Court stated:

> There was no applicable provision of the policy limiting the extent of defendant's liability to a resumption of normal operations in some "obtainable" property other than that of the Twelfth Street address (the insured premises). We bear in mind the liability under the policy was expressly the actual loss sustained for the "length of time" which would be required to rebuild, repair or replace the property destroyed.

Coverage, under this interpretation, continued as long as it would have taken to repair the insured premises. Since it was an actual loss policy as opposed to a valued policy which exists in the instant case, the net profits from the other new plant were considered to reduce the loss sustained. Since this case concerns a valued policy, the profits at other plants need not be considered.

Harbor offered a thirty-three day settlement on the business interruption claim on the basis that thirty-three days, plus the seven-day waiting period in the contract, would be sufficient to have the power restored to the building, test the equipment and run the conveyors temporarily until installation could proceed. This was rejected as a final settlement by OPS but payment was made and accepted of thirty-three days coverage or $107,580 as a partial settlement. GAB agreed to wait until installation had been completed before making further recommendations to Harbor Insurance Company.

The inadequacy of this settlement offer is clear from the claim adjustment reports from GAB to Harbor. On June 3, 1975, GAB stated:

> We might mention again that it is impossible for insured to operate due to the condition of the lot adjacent to insured's building. Removal of the debris is a momentous task and is hampered by the condition of the soil resulting from the use of eight million gallons of water during the first night and subsequent continuous discharge of the two-and-a-half inch line for approximately four weeks to prevent the smoldering remaining debris from flaming. The Omaha City Government has also prohibited insured from operating under present conditions. We have made it clear to the public adjuster and to insured in writing that this coverage is not involved in any suspense resulting to damage from finish stock, water-soaked ground or civil authority.

This report was made forty-four days after the fire. Were it possible to operate the plant temporarily using the damaged equipment, such operations could not even begin until some time after June 3, 1975. In addition, GAB's assertion that the suspension resulted from water-soaked ground or civil authority and is, therefore, not compensable, ignores the obvious: the water-soaked ground and directives by civil authorities are the direct result of the fire, a risk covered by the policy.

In weighing testimony of the witnesses, the evidence establishes that the belts could not have been used on a temporary basis while the replacements were ordered and installed. Given that finding, this Court must determine how many days of total time that operations were suspended are covered by the business interruption policy. In making this determination, the Court must consider the respective duties of the parties under the contract and whether those duties were fulfilled.

On May 27, 1975, the attorney for OPS wrote to GAB informing them of the following:

> In order that we may avoid any future controversy with respect to the exercise of due diligence on the part of our client, we respectfully request that you advise us by letter as to any matter which will expedite resumption of operations by Omaha Paper Stock.

GAB failed to respond to the letter. In the second claim progress report from GAB to Harbor Insurance, GAB stated:

> We call your attention to insured's attorney's letter of May 27, 1975, regarding this claim. We do not expect a reply to this letter for obvious reasons. It would be impossible to anticipate every way in which the insured could fail to exercise due diligence.

OPS asserts that their request shifted the burden to Harbor to inform OPS when it was not duly diligent. OPS contends by inference, that Harbor's failure to affirmatively reject the shift of responsibility led OPS to rely on Harbor's silence as an indication that OPS was meeting the due diligence requirement under the insurance policy. OPS argues that Harbor is estopped from contending that any delay is attributable to lack of due diligence by OPS. The facts in this case do not provide a foundation for the application of an estoppel theory. Estoppel might operate where the insured had agreed to act in the event of a particular contention. But that situation does not exist in this case. GAB never responded to the letter of May 27, 1975, nor did they verbally accept the responsibility to inform OPS of any failure by OPS to perform as required under the contract. OPS cannot rely on silence as an acceptance of the attempt to shift the burden of responsibility under the due diligence clause of the contract.

The logic of this conclusion is closely analogous with the principles of offer and acceptance in contract: OPS made a proposed shift of responsibility or burden to which GAB either did not respond at all, or rejected. As stated in *W. Wright, Inc. v. Korshoj Corp.*, 197 Neb. 692, 705, 250 N.W.2d 894, 901 (1977):

It is the law that if a party to an existing contract proposes a modification thereof, the mere silence of the other party leaves the contract as before without modification. *Elgin Mills, Inc. v. Melcher*, 181 Neb. 17, 146 N.W.2d 573 (1966). *See also J. A. Markel Company v. D. L. Stokes & Co.*, 197 F.2d 933 (5th Cir. 1952); *Restatement, Contracts* 2d, Section 72; *Williston on Contracts*, Section 91; *David City Hospital v. Teckla Gilmore, et al.*, 184 Neb. 342, 167 N.W.2d 397 (1969).

In view of this analysis, the Court finds that OPS was not relieved of its contractual obligation to proceed with due diligence to "resume full operation of their business . . . ."

■ The insurance company asserts that the delay is attributable to a failure by OPS to proceed with due diligence in acquiring and installing the equipment. The facts demonstrate, however, that much of the delay is attributable to the decisions made by Harbor and its adjusters. Harbor cannot argue that its liability is limited to the theoretical time for replacement if, due to its own actions, the actual replacement time far exceeds the theoretical number of days.

Within eight days of the fire, Charles Cook the original installer, had arrived in Omaha at the request of OPS and recommended replacement of the belts and agreed, if his recommendation was accepted, to perform the installation. However, the insurance company did not authorize the replacement until May 23, 1975, almost a month later. GAB chose to order the belts through Economy and to have Economy perform the installation. The belts arrived in Omaha on June 27, 1975, fifty-one days into the coverage period. Economy's installer did not arrive at OPS until July 14, sixty-four days into the coverage period, but was totally unprepared to begin work. When it was clear that the Economy installer would be unable to perform the installation, GAB authorized Cook to do the installation. However, since Cook was given no advanced warning, he agreed to perform the installation subject to his prior commitments. Cook began installation on July 23, 1975, the seventy-second day of the coverage period. With the exception of the week of August 4 through 9, Cook worked steadily until August 22. However, due to prior commitments and a misunderstanding concerning who was responsible to pay for the installation, Cook did not work again until September 22, and then worked through September 27, the one hundred twenty-eighth day of the coverage period.

Therefore, due to the actions (and inactions) of GAB adjusters and Harbor in regard to matters under their direct control, complete installation was delayed for at least one hundred twenty-eight days after the initial waiting period.

■ The requirement of due diligence on the part of the insured must be juxtaposed with the actions of the insurer. Harbor, through its adjusters at GAB essentially took over the decision of whether to repair or replace the belts. However, that assumption of responsibility by the insurer to make the actual decision did not eliminate the duty of the insured to perform functions that are peculiarly within its province. The insured cannot consciously ignore an apparent mistake made by the insurer in this type of a claim adjustment. Nor can an insured fail to inquire when such an inquiry is dictated by good business practice.

■ The OPS plant had five conveyor belts, four of which were cleated belts and the fifth was a smooth belt. A total of four belts were replaced, including the non-cleated forty-two inch belt. Mistakenly, a cleated belt was ordered to replace the non-cleated one. This cleated belt was the first belt installed in late July. After the mistake was discovered, a replacement was ordered, which arrived at OPS on September 30, 1975. That belt was installed during the week of October 6 through 10. The Court must decide which party must bear the responsibility for that mistake.

After GAB decided that the belts should be replaced, they instructed Epstein, president of OPS, to place the order for the belts with the supplier. While it has been estab-

lished that one of the adjusters had provided a description of the needed parts to the supplier several weeks earlier for a price quotation, there is no evidence that those adjusters checked with either Epstein or the OPS plant manager or the designer and installer of the original belts to ascertain exact specifications. Indeed Epstein specifically denies ever having seen the letter which delineated the specifications. Epstein simply referred to that earlier order and did not review the belt specifications with the supplier at the time of the order. When the belts arrived in Omaha in late June, they were piled on two flatbed trucks and were moved to a storage warehouse until installation. There was no "specific effort" made by OPS personnel to ascertain whether the belts which had been ordered had been delivered or whether the correct belts had been ordered in the first place. The belts remained untouched from June 27 to July 23 when the installation crew began work. By August 1 the crew had installed the incorrect forty-two inch cleated belt. The mistake was discovered by OPS personnel after the belt had been installed.

Had Epstein checked the specifications when he placed the order, the attendant delay would have been avoided. The belts that Epstein was ordering were to be exact duplicates of the existing belts. These belts were essential to the OPS operation and Epstein and his manager were the only persons involved in this transaction who were familiar with the specifications for the necessary equipment. Good business practice under the facts in this case would have been to check the specifications before ordering.

The conclusion that OPS was not sufficiently diligent in this regard is strengthened by the fact that ample opportunity existed for OPS to check the equipment that arrived to make certain that what had been ordered had indeed been shipped. Had OPS checked during the month that the belts were stored prior to installation,

the mistaken order would have been discovered and some, if not all, delay attributable to the mistake would have been avoided. Therefore, had the correct belt been ordered, a mistake which is attributable to OPS, it would have been unnecessary for Cook to return after September 27, 1975, for additional installation work. OPS must bear the burden of this error.[1]

The evidence established that after the installation crew finished its work on October 10, 1975, the plant remained inoperative until the baling equipment was checked. The serviceman for the equipment testified that in order to test the baling equipment one needed to be able to load material into the baler and test it under actual working conditions. The plant manager, however, testified that together with the sixty-inch conveyor and the ninety-six inch conveyor (which was not damaged or replaced), a portable forty-two inch conveyor could be used and material could be loaded into the baler. This portable conveyor had been used in the past to help unload rail cars as fast as possible. The work records of the installation crew show that the sixty-inch conveyor was completely rebuilt by September 22, 1975. By using the portable conveyor in addition to the sixty-inch and the ninety-six inch conveyors, OPS personnel could have begun testing the equipment on September 22, 1975, and have been finished by the end of the month.

In conclusion, while it has been established that OPS is responsible for the delays caused by the mistaken order of the cleated belt and by not attempting to test the baler as soon as equipment was available for such a procedure, Harbor is liable for business interruption coverage through September 30, 1975, the date when, but for the delays attributable to OPS, the plant could have been back in operation. Under the terms of the policy and the per diem valuation of the policy, Harbor is liable for $423,800, less $107,580 already paid in par-

---

1. The evidence also established that the bent tail pulley shaft resulted when GAB's engineer operated the belts in May. Accordingly, Harbor must bear the burden of that mishap. However, since no evidence was introduced which establishes a delay beyond September 30, 1975, as a result of this error, Harbor's liability is not altered.

tial settlement of the claim, or a total of $316,220, plus interest and attorney fees yet to be determined. In light of this decision, the counterclaim of Harbor for $107,580 plus interest, the amount already paid to OPS in partial settlement, is denied.

An order herein, according to this memorandum, will not be entered until such time as the parties are heard with reference to attorney fees and interest. To that end, if the parties are unable to agree and stipulate as to those two items, without prejudice to their respective rights to appeal, within ten (10) days from date hereof, they shall so notify this Court so that a hearing date may be scheduled and the matter presented to the Court for determination.