**OMAHA PAPER STOCK COMPANY,**
**Appellant,**

v.

**HARBOR INSURANCE COMPANY,**
**Appellee.**

**OMAHA PAPER STOCK COMPANY,**
**Appellee,**

v.

**HARBOR INSURANCE COMPANY,**
**Appellant.**

Nos. 78–1342, 78–1369.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 4, 1978.

Decided March 28, 1979.

James O. White, of Cummins, White, Robinson & Robinson, Los Angeles, Cal. (argued), and James R. Robie, Los Angeles, Cal., on brief, for appellant Harbor Ins. Co.

Clayton Byam, Omaha, Neb., argued and on brief, for appellee Omaha Paper Stock Co.

Before STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.

STEPHENSON, Circuit Judge.

Defendant-appellant Harbor Insurance Company appeals from the trial court's[1] interpretation of and consequential ruling on a use and occupancy-business interruption insurance contract with the insured, plaintiff-appellee Omaha Paper Stock Company. Harbor contends (1) that the trial court failed to consider Omaha's increased use of and output at a second plant after the fire at the insured plant; (2) that as a result of the use of the second plant, Omaha did not suffer a total suspension of business as defined by the contract; (3) that therefore Omaha did not qualify for the full "valued" per diem payment of $3260 to be paid in the event of a total suspension of business; (4) and that the attorney fee awarded to Omaha's counsel by the trial court is excessive. Harbor cross-appeals on the trial court's denial of prejudgment interest. We hold there was a total suspension of business as defined by the insurance contract and thus affirm the trial court's decision.

Omaha Paper Stock was in the scrap paper processing business. It had two plants in Omaha; a plant located at 1401 Laird Street which handled low-grade scrap paper, and a plant located at 846 South 18th Street, which handled high-grade scrap paper. The record indicates that there is a significant difference between the methods of processing low-grade scrap paper and high-grade scrap paper. High-grade scrap paper processing requires a substantial amount of manual handling; low-grade paper processing can largely be accomplished with little manual handling.

The business at the Laird Street address (the business with which we are primarily concerned) consisted of buying, sorting, bailing, shipping and selling the low-grade scrap paper, i. e., newspapers collected by public service groups. There is also some evidence in the record suggesting that Omaha Paper Stock would occasionally act as a broker; it would find a seller who sorted and bailed its own paper and match

that seller with a buyer. When this occurs it is not necessary for the paper to pass through either of the Omaha plants.

The relevant portions of the contract are as follows:

| | |
|---|---|
| Insured's Name and Address: | OMAHA PAPER STOCK COMPANY<br>846 SOUTH 18TH STREET<br>OMAHA, NEBRASKA |
| Type of Coverage: | VALUED BUSINESS INTERRUPTION |

\* \* \* \* \* \* \*

| | |
|---|---|
| Assured: | OMAHA PAPER STOCK COMPANY |

$586,800 on the use and occupancy of all buildings and/or structures and/or machinery and/or equipment and/or raw stock or stock in process contained therein upon the premises owned and/or leased and/or occupied by the Assured, and situated at

1401 LAIRD STREET
OMAHA, NEBRASKA

and operated by the Assured principally as

SCRAP PAPER PROCESSING [Clause A]

## INSURING CLAUSE

TOTAL SUSPENSION: The conditions of this contract of insurance are that if the said buildings and/or structures and/or machinery and/or equipment and/or raw stock or stock in process contained therein shall be destroyed or damaged by Fire, Lightning, Explosion, Aircraft, Vehicles, Windstorm, Strikers, Riot(er)s, or Smoke, as hereinafter defined, occurring during the term of this Certificate so as to necessitate a total suspension of business then this insurance shall be liable at a rate of $3,260 per working day/xxxxxxx for such total suspension. [Clause B]

PARTIAL SUSPENSION: If the property damage due to perils insured against results in partial suspension of business then this insurance shall be liable for such proportion of $3,260 per working

1. The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska. Opinion published at 445 F.Supp. 179 (D.Neb.1978).

day/xxxxxxx which the proportion of reduction in output bears to the total production which would, but for such partial suspension, have been obtained during the period of partial suspension. [Clause C]

### CONDITIONS

It is a condition of this contract that the length of time or suspension for which loss may be claimed hereunder shall not exceed 180 days at any one location, and shall commence on the eighth day following the date of damage to the property insured hereunder, but loss shall not be claimed for days on which the operations of the assured are not normally performed. The length of time for which suspension may be claimed shall not be limited by the date of expiration of this contract.[2] [Clause D]

* * * * * *

It is a condition of this insurance that buildings, surplus machinery or duplicate parts thereof, equipment, raw stock or stock in process which may be owned, controlled or used by the Assured, shall in the event of loss be used to expedite the continuance or resumption of business. [Clause E]

* * * * * *

In the event of a loss as defined in the Total Suspension Clause herein it is understood and agreed that should the Assured be provided other suitable facilities with which to operate, then upon resumption of operations with such other facilities such loss if any shall be adjusted as defined in the Partial Suspension Clause of this Certificate. [Clause F]

In consideration of the premium charged hereunder it is understood and agreed that this Certificate also covers such extraordinary expenses as are necessarily incurred (with the consent and approval of Underwriters or their representatives hereon) for the purpose of reducing any loss under this Certificate (except expenses incurred to extinguish the fire)

not exceeding, however, the amount by which the loss under this Certificate is reduced thereby. [Clause G]

In the event of the described property being so destroyed or damaged as to give rise to a claim hereunder, Underwriters agree that this insurance may be reinstated (subject to prior agreement by Underwriters) without additional premium, but this shall not be construed to increase the daily/weekly/or monthly indemnity specified in the total or partial suspension clauses nor extend the period of indemnity specified in this certificate. [Clause H]

* * * * * *

DUE DILIGENCE CLAUSE: The Assured shall use due diligence and do and concur in doing all things reasonably practicable, namely, (1) to avoid the happening of any peril insured against and (2) to resume full operation of their business as early as practicable after any interruption.

It is understood and agreed that loss, if any, hereunder shall be computed on the basis of the time of actual interruption but in no event exceeding the time which it would take with ordinary diligence and dispatch to repair and/or replace the property herein described, nor shall Underwriters be liable as regards the replacement of raw stock or stock in process for a longer period of time than that during which damaged or destroyed raw stock or stock in process would have made operations possible. The indemnity period shall not be limited by the date of expiration named in this Certificate. [Clause I]

The Laird Street plant was destroyed by fire on April 20, 1975.

The problem with which we are confronted is the effect of the increased production at the 18th Street plant of low-grade paper processing (which took place as a result of the fire destroying the Laird Street plant's

---

2. This is the amended version of clause D as found in Endorsement No. 4.

capacity for production)[3] on the liability of Harbor Insurance Company. Specifically, we are concerned with Clause E which provides, as a condition of the insurance, that Omaha shall use, in the event of a loss, any "buildings, surplus machinery or duplicate parts thereof, equipment, raw stock or stock in process which may be owned, controlled or used" by Omaha to "expedite the continuance or resumption of business."

The trial court interpreted this clause to mean that any such surplus buildings or machinery, etc., must be used to expedite or continue the production of low grades of paper "at the Laird Street plant itself." "[S]urplus production capacity at another and different plant * * * would have no effect upon the resumption or continuation of the plant covered by the insurance policy." *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 445 F.Supp. 179, 184–85 (D.Neb. 1978). Consequently, the production at the 18th Street plant of some low-grade scrap paper processing does not affect the necessary determination of whether there was a total suspension of business as the term is used in Clause B. *Id.* at 183–85.

The trial court consequently found that there were 152 working days lost as a result of the fire. Inasmuch as Omaha contributed to the delay of repairing the business, Harbor Insurance Company was found liable for only 130 of the days. Neither party appeals on the basis of this finding.

■ We agree with the trial court that Clause E is not a mitigation of damages clause; it is a condition of the insurance which requires Omaha, in continuing or resuming business at the Laird Street plant, to use any buildings or equipment that it has which will expedite that process.

■ At the outset, it is necessary to define the contract terms. The first rule of contract construction is that contracts should be viewed as a whole. *Kansas-Nebraska Natural Gas Co. v. Hawkeye Security Ins. Co.*, 195 Neb. 658, 240 N.W.2d 28, 30 (1976). While an ambiguous contract is to be interpreted in favor of the insured, should the ambiguity allow such an interpretation, "[c]onstruction ought not to be employed to make a plain agreement ambiguous," in order to construe it against the insurer. *Wyatt v. Woodmen Accident & Life Co.*, 194 Neb. 614, 618, 234 N.W.2d 217, 220 (1975); *Cordes v. Prudential Ins. Co.*, 181 Neb. 794, 150 N.W.2d 905 (1967). Thus, limitations and exceptions in regard to liability of the insurer, if plainly expressed, should be enforced. *Wyatt v. Woodmen Accident & Life Co., supra*, 234 N.W.2d at 219. And finally, an insurance contract should be read and "given effect according to the ordinary sense of the terms used" just as any other contract. *Pettid v. Edwards*, 195 Neb. 713, 240 N.W.2d 344, 346 (1976); *Cordes v. Prudential Ins. Co., supra*, 150 N.W.2d at 908.

We do not find the Omaha-Harbor insurance contract ambiguous. In any event, ambiguities are to be interpreted against the insurer.

■ We note that this insurance contract is a valued insurance policy. A valued insurance policy does not look to the profits, losses, or real value of the property at the time of casualty; instead, the parties agree to a value of the property or ongoing business as a part of the contract.[4]

The valued policy, more often than not, is designed to cover total losses; it can also be

---

**3.** The trial court found that the Laird Street business utilized the surplus production capacity at the 18th Street plant. *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 445 F.Supp. 179, 184 (D.Neb.1978).

The record before us does not reflect with certainty what proportion of the Laird Street business was continued at the 18th Street plant as a result of the fire destruction, but the trial court found that "the record indicates that 18th Street began to process a small percentage of the total production of lower grades of paper

(newspaper and corrigated paper) which had been processed at Laird Street." *Id.* at 184.

**4.** *See* R. E. Keeton, Insurance Law Basic Text, 141–42 (West 1971). The origination of this type of "valued" policy appears to be in marine insurance, where, in writing the insurance contract at the commencement of the voyage, the insurer and insured stipulated a value of the cargo; this obviated the problem of later, after mid-voyage loss, trying to determine the value at the time of loss. *Id.* at 140.

used, however, to cover partial losses, as the contract involved here allowed. R. E. Keeton, Insurance Law Basic Text 140–42 (West 1971). The parties stipulated to a value of the ongoing business at the Laird Street address of $3260 per day (with a limit of 180 working days ($586,800) total loss allowed to be claimed). The partial suspension clause provides that the valued policy also covers necessary partial suspensions of business, and allows a daily valued payment to be made—the payment to be in proportion to the reduction in output of goods.

 The term "use and occupancy" is generally used interchangeably with the term "business interruption," Appleman, 4 Ins.L. & Prac. § 2329, p. 323 (West 1968)—indeed, they are both used somewhat interchangeably in this contract. The terms both go to coverage of losses sustained when for one reason or another the operation of the business is interrupted. Business interruption insurance generally puts the insured into the monetary position it would have been in but for the interruption of its business. Use and occupancy insurance provides the same type of coverage, but tends to focus on the business use which the property was capable of prior to the loss.

A case in which a definition of use and occupancy arises out of a factually similar situation is *Michael v. Prussian Nat'l Ins. Co.*, 171 N.Y. 25, 63 N.E. 810 (1902). In *Michael*, the policy read " 'on the use and occupancy of their property and elevator building; with boiler and engine houses attached, situate \* \* \* in Buffalo, New York, and known as the "Dakota Elevator." ' " *Id.* 63 N.E. at 811.

Consequently, when the elevator was destroyed by fire so as to prevent use and occupancy, the insurance company was liable for the agreed-upon (valued) per diem for the length of time (with ordinary due diligence and dispatch) it would take to rebuild the elevator to its former capacity.

The insurance company had argued that the term "use and occupancy" required a determination of the loss of profits and earnings resulting from the loss of the use and occupancy of the elevator, as opposed to the mere fact of whether the elevator was capable of being used and occupied by the insured. Thus if, in spite of the loss of use and occupancy, profits and earnings were not lost, the policy would be inapplicable.[5]

The insured argued that the policy did not relate to earnings and profits, but rather, it related to a fixed sum to be paid when loss of use and occupancy occurred as a result of fire. Thus, even if the insured gained from the loss of use and occupancy, the value agreed upon was still owed by the insurance company. The court agreed with the insured.

That the policy in question here was a "valued" use and occupancy policy indicates that the parties wished to avoid post-fire determination of the value of the ongoing business which the use and occupancy of the buildings and machinery at the Laird Street address made capable.

The trial court's analysis of this contract includes reference to *City Tailors, Ltd. v. Evans*, 126 L.T.N.S. 439 (1921), and *Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co.*, 4 F.2d 835 (5th Cir.), *cert. denied*, 268 U.S. 704, 45 S.Ct. 639, 69 L.Ed. 1167 (1925).

In *City Tailors*, the use and occupancy policy covered the business of a clothing factory. The insurance policy provided a stipulated per diem payment to be made each day the work at the factory was prevented due to fire damage. The policy also contained a "due diligence" clause which required the insured to do "all things reasonably practicable to minimise" the loss. *City Tailors, Ltd. v. Evans, supra*, 126 L.T. N.S. at 440.

Following the fire, the insured continued the business of clothing production at a temporary location. The court held that the insured was entitled to keep the profits

---

5. This could occur if a business were operating at a loss prior to the fire.

from the temporary location in addition to recovering the full per diem for the total suspension of production at the insured's factory. The trial court quotes from Lord Judge Scrutton's opinion in *City Tailors*:

> If the assured cannot by reasonable exertions produce an output at [the original factory] there is a total loss; to the extent to which, acting reasonably, his output at [the original factory] is diminished there is a partial loss. In other words, the subject matter of insurance is limited locally; it is profits at [the original factory] derived from output at [the original factory]. The insurance is on a business carried on at [the original factory], not elsewhere; and it is interruption of, or interference with, that business at [the original factory] by fire which causes the loss.

*City Tailors, Ltd. v. Evans, supra,* 126 L.T. N.S. at 443, *quoted in Omaha Paper Stock Co. v. Harbor Ins. Co., supra,* 445 F.Supp. at 184.

The *Hartford* case included a "use and occupancy" policy somewhat similar to the immediate one; although it was not a valued policy, as is the immediate one, it did provide a maximum per diem to be paid in the event of a "total suspension of the business." *Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co., supra,* 4 F.2d at 836. The contract defined "business" as " 'In a manufacturing property: "The production of goods," ' etc." *Id.* at 836. The relevant conditions of the contract were:

> * * * [A]s soon as practicable after any loss the Assured shall resume complete or partial operation of the property herein described, and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in the event of the assured continuing business (in whole or in part) at some other location or using other property during the time occupied in repairing or reconstructing the property named herein, the net profits so earned shall be applied to the reduction of the loss, and adjustment shall be made as provided herein for partial losses.
>
> \* \* \* \* \* \*

> During the time of a total suspension of business, liability under this policy shall not exceed $70, for each business day of such suspension; during the time of a partial suspension of business, the per diem liability under this policy shall not exceed that proportion of the per diem liability which would have been incurred by a total suspension which the decrease in production (or business) bears to the full daily production (or business) at the time of the fire.

*Id.* at 836–37.

The insured suffered a loss of one of the several buildings used in the business. The particular building destroyed by fire had housed the principal operations of plaintiff's business in that it was the one in which the production and manufacturing process was carried on. The other buildings included a powerhouse, a machine shop, a laboratory and storage facilities.

The plaintiff built a temporary facility following the fire in order to continue the mixing of the fertilizer. Instead of manufacturing the ingredients, however, plaintiff purchased them. By use of the temporary facilities, plaintiff was able to produce fertilizer at two-fifths the level of production prior to the fire. Because of the cost involved, however, plaintiff made no net profits as a result of the continued production. The question raised was the applicability of the reduction of loss clause; i. e., should the production at the temporary facilities be taken into consideration when determining whether the insurance company was liable for a total or partial suspension of business.

The Fifth Circuit did not consider the production at the temporary facility as creating a partial, as opposed to total, suspension of business. The reasons for the court's decision were (1) that the business covered by the contract was specifically defined as the manufacturing of fertilizer—not merely the mixing of the ingredients; and (2) that the adjustment for partial loss clause of the contract referred specifically to net profits and not to the proportion of output continued in relation to past output.

Plaintiff did not continue in the same business in which it had been engaged before the fire. The manufacture of fertilizers as theretofore conducted entirely ceased, and the plaintiff, by purchasing, instead of manufacturing, the ingredients of its fertilizers, engaged in a different kind of business, in an effort to diminish its own as well as defendant's loss. Defendant was not entitled to have the loss under the policy reduced, unless net profits were earned by the plaintiff. In our opinion the adjustment referred to in * * * the clause for diminution of loss means adjustment of net profits, and does not come into play unless net profits should be earned. If, as contended by the defendant, there should be an adjustment in the proportion that the fertilizers bought and mixed by the plaintiff during the period of suspension of business bore to the full normal production of fertilizers manufactured and mixed during such period, even though no net profits were earned, then the policy would be of no value to an insured, because it would be possible, by multiplying temporary plants, to produce the full normal output, although the cost might be prohibitive. We do not think the policy is open to such a construction.

*Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co.*, supra, 4 F.2d at 838.

Thus, in both *City Tailors* and *Hartford*, the courts did not consider the production at another plant when determining if there had been a total or partial suspension of business as defined by the "use and occupancy/business interruption" policies, and in *Hartford* it would only have been considered as an adjustment to the loss if there had been net profits, in accord with the adjustment of loss provision.

To further support its conclusion that the extra processing of low-grade scrap paper at the 18th Street address is not relevant to a determination of total or partial suspension of business as defined by the Omaha-Harbor insurance contract, the district court relies upon *Beautytuft, Inc. v. Factory Ins. Assoc.*, 431 F.2d 1122 (6th Cir. 1970),

and *Hawkinson Tread Tire Serv. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 362 Mo. 823, 245 S.W.2d 24 (1951). In both of these cases the plants were destroyed by fire and the insureds established operations shortly thereafter at other locations.

The *Beautytuft* contract provided for recovery due to business interruption for "the ACTUAL LOSS SUSTAINED * * * *for only such length of time as would be required with the exercise of due diligence* * * * *to rebuild, repair or replace such described property* * * *." Beautytuft, Inc. v. Factory Ins. Assoc., supra*, 431 F.2d at 1124. This is similar to the due diligence clause in the instant contract (Clause I). It was a condition of the contract that if the insured could "reduce the loss resulting from the interruption of business, * * * by making use of other property * * * described herein or elsewhere * * * such reduction shall be taken into account in arriving at the amount of loss hereunder." *Id.*

The insurance company argued that plaintiff was in full production at the new location within approximately three and one-half months after the fire—thus, there was no longer any "business interruption" and the insurance company should not be required to make further payments for any losses sustained beyond that date. Holding the contract language "repair, rebuild or replace" to mean to do those things on the described premises, the Sixth Circuit held that plaintiff should recover for the *theoretical* time period it would have taken to rebuild the plant, adjusted in accord with the contract provision requiring the plaintiff to make use of other property. Thus, plaintiff recovered the actual loss due to business interruption resulting from the fire—the loss per day on the theoretical time period offset by any gains made at the second plant.

In *Hawkinson*, the contract was almost identical, in relevant parts, to the contract in the instant case, except that the *Hawkinson* contract provided for indemnification

for the "actual loss sustained" as opposed to a valued loss. The *Hawkinson* contract was identified by the Supreme Court of Missouri as one "indemnifying plaintiff for damage or destruction by fire of the 'use and occupancy' of the described property necessitating an interruption of business[;]" the contract provided that payment of the loss sustained would continue for the length of time that, with due diligence, it would take to rebuild, repair or replace the destroyed property. It also provided that the insured should "make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in [such event] * * * such reduction shall be taken into account in arriving at the amount of the loss hereunder." *Hawkinson Tread Tire Serv. Co. v. Indiana Lumbermens Mut. Ins. Co., supra,* 245 S.W.2d at 26.

Thus, as in *Beautytuft,* the court in *Hawkinson* found that:

> There was no applicable provision of the policy limiting the extent of defendant's liability to a resumption of normal operations in some "obtainable" property other than that of the Twelfth Street address. We bear in mind the liability under the policy was expressly the actual loss sustained for the "length of time" which would be required to rebuild, repair or replace the property destroyed.

*Id.* at 29.

Insofar as the use of the second plant was concerned, the Supreme Court of Missouri added:

> However, under the "resumption of operations and use of other property" clause, * * * the actual profit and loss experience thereafter at the Market Street address was necessarily and properly taken into account in any *reduction* of the loss sustained.

*Id.*

On the basis of the contract and these cases, the district court's analysis focused upon the fact that the Laird Street business was the one covered in the contract, and that the resumption or continuance of the business requirement (Clause E) referred to resuming or continuing operations *at the Laird Street address.* Thus the due diligence clause referred to rebuilding or repairing the Laird Street plant, and as in *Beautytuft* and *Hawkinson,* it was that time period for which the indemnification was to be paid (here, a valued sum). Because the surplus production capacity of the 18th Street plant did not affect, nor could it help, the resumption or continuance of business at the Laird Street address, such surplus production was not taken into consideration in determining whether there had been total or partial suspension of the business. *Omaha Paper Stock Co. v. Harbor Ins. Co., supra,* 445 F.Supp. at 184–85. Thus, Harbor was liable under the total suspension of business clause (Clause B). The only manner in which operations at another plant could be considered would be in mitigation of the loss—i. e., in *Beautytuft* and *Hawkinson,* the policies had mitigation of loss provisions. Harbor contends that Clause E is such a clause, but Clause E does not require any mitigation of loss.[6] It only requires that Omaha use all available facilities to resume or continue its business at the Laird Street address.

Appellant also contends that some of the Laird Street brokerage business was continued following the fire. At a minimum, to carry on the brokerage business at the Laird Street address, an office would be

---

6. Appellants cite *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.,* 360 F.2d 531 (8th Cir. 1966), *modifying and affirming,* 243 F.Supp. 386 (D.Iowa 1965), and *Steel Products Co. v. Millers Nat'l Ins. Co.,* 209 N.W.2d 32 (Iowa 1973), as analogous cases. Both of the contracts in those cases had specific reduction of loss clauses requiring the insured, "if [it] could reduce the loss resulting from the interruption of business," to make use of other property. *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.,* 243 F.Supp. 386, 387 (D.Iowa 1965), and *Steel Products Co. v. Millers Nat'l Ins. Co., supra,* 209 N.W.2d at 34–35. The clause in the Harbor-Omaha contract does not refer to reduction of *loss* by use of other property. It refers to continuing or resuming the business at the Laird Street address by use of other property.

needed, and the record reflects that the office at the Laird Street plant was destroyed. Further, if the business was not carried on from the Laird Street address, it is not applicable to the question of whether there was a total suspension of business. Finally, the brokerage business prior to the fire did not require the "use and occupancy" of the plant, so the brokerage business was not within the terms of the contract. Thus, there is not sufficient evidence to show that brokerage business, even if carried on, resulted in only a "partial suspension of business" under the terms of the contract.

Appellant also contends that the court's allowance of attorney fees was excessive and based upon an arbitrary percentage of the total judgment.

■ There is little support for appellant's allegation that the trial court awarded the fee based upon an arbitrary percentage of the total judgment. The trial court conducted a separate post-trial hearing and heard testimony on the matter of the fees. The court considered the factors relevant to a determination of a reasonable fee, *see* *Grunin v. International House of Pancakes*, 513 F.2d 114, 127–28 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and based upon the evidence and briefs of the parties, the court allowed $96,000.[7] Award of attorney fees is a matter of discretion for

the trial court and we will not disturb the award unless there has been an abuse of that discretion. The award of $96,000 is a substantial award—indeed, it appears to be quite generous. We are not prepared to say such an award is an abuse of discretion, however.

The district court noted that the case was a "complex and protracted case," and found the sum of $96,000 to be "fair and reasonable, but not excessive or punitive in any respect." We affirm the trial court's award of attorney fees.[8]

■ Appellee contends on cross-appeal that the court erred in failing to award prejudgment interest. The trial court decided the issue of prejudgment interest in conjunction with the hearing on fees. Nebraska law requires prejudgment interest when the amount of the claim is liquidated.[9] *Abbott v. Abbott*, 188 Neb. 61, 195 N.W.2d 204, 209 (1972); *Mintken v. Nebraska Surety Co.*, 187 Neb. 215, 188 N.W.2d 819 (1971). The trial court found that the claim in this case was not liquidated inasmuch as the amount due and owing was not ascertainable prior to judgment. Such amount would depend upon a determination of various conditions in the contract imposing contractual obligations upon Omaha; for example, the due diligence clause of the contract imposed duties upon Omaha as prerequisite to Omaha recovering the full valued amount in the contract.

We agree with the trial court and affirm the denial of prejudgment interest.

7. Neb.Rev.Stat. § 44–359 (1974) provides for the allowance of attorney's fees in this type of case, including attorney's fees on appeal.

8. We specifically note that the $96,000 was the total compensation received by the attorneys:
> THE COURT: Now, so I have this straight, Fritz, you and Mr. Byam have charged your client on an hourly basis?
> MR. CASSMAN: That's correct.
> THE COURT: For your services rendered, with the understanding that whatever attorney fees the Court awards will be paid to you and Mr. Byam on top of and in addition to the hourly charge to date?
> MR. CASSMAN: Not quite. With the exception that—let me put it this way—to the extent that that allowance may exceed what we have been already paid, the excess would be received by us as a premium. In other

words, if the Court would allow "X" dollars and we have already been paid "Y" dollars, and if "X" exceeds—
> THE COURT: No, say it in numbers, don't say it in letters.
> MR. CASSMAN: Well, if the Court were to allow an attorney fee in this case, say $100,-000.00 attorney fee in this case, and we have already been paid $40,000.00, that Mr. Byam and I would receive $100,000.00, and we would refund to the client out of that the $40,000.00 previously paid to us.
> THE COURT: Very well.
> MR. CASSMAN: So, to the extent that there would be an excess over what we have charged, Mr. Byam and I would receive that excess.

9. Neb.Rev.Stat. § 45–104 (1974).

Costs taxed to appellant. However, attorney fees on appeal [10] will not be allowed in view of the generous award below.

Affirmed.