224 P.3d 960

**AZTAR CORPORATION, a Delaware Corporation, Plaintiff/Appellant,**

v.

**U.S. FIRE INSURANCE COMPANY; Westchester Surplus Lines Insurance Company; Essex Insurance Company; Certain Underwriters at Lloyd's, London; Axis Specialty Limited; Hartford Fire Insurance Company; Zurich American Insurance Company, Defendants/Appellees.**

No. 1 CA–CV 08–0562.

Court of Appeals of Arizona, Division 1, Department T.

Jan. 28, 2010.

464

Fennemore Craig, P.C. By Timothy J. Burke, Phoenix, Attorneys for Plaintiff–Appellant Aztar Corporation.

Covington & Burling LLP By David B. Goodwin, San Francisco, CA, (Admitted pro hac vice) Attorneys for Plaintiff–Appellant Aztar Corporation.

Renaud, Cook, Drury, Mesaros, PA By Steven G. Mesaros, Phoenix, Attorneys for Defendants–Appellees U.S. Fire Insurance Company; Westchester Surplus Lines Insurance Company; Essex Insurance Company; Certain Underwriters at Lloyd's, London; and Axis Specialty Limited.

Clausen Miller, P.C. By Melinda S. Kollross, (Admitted pro hac vice) Edward M. Kay (Admitted pro hac vice) Celeste A. Hill (Admitted pro hac vice), Chicago, IL, Attorneys for Defendants–Appellees U.S. Fire Insurance Company; Westchester Surplus Lines Insurance Company; Essex Insurance Company; Certain Underwriters at Lloyd's, London; and Axis Specialty Limited.

Clausen Miller, P.C. By Andrew C. Jacobson (Admitted pro hac vice) Courtney E. Murphy (Admitted pro hac vice), New York, NY, Attorneys for Defendants–Appellees U.S. Fire Insurance Company; Westchester Surplus Lines Insurance Company; Essex Insurance Company; Certain Underwriters at Lloyd's, London; and Axis Specialty Limited.

The Cavanagh Law Firm, P.A. By Scott A. Salmon, Christopher Robbins, Phoenix, Attorneys for Defendant–Appellee Hartford Fire Insurance Company.

Lewis Brisbois Bisgaard & Smith By James K. Kloss, Phoenix, Attorneys for De-fendant–Appellee Zurich American Insurance Company.

Mound Cotton Wollan & Greengrass By Philip C. Silverberg (Admitted pro hac vice) Mark S. Katz (Admitted pro hac vice), New York, NY, Attorneys for Defendant–Appellee Zurich American Insurance Company.

## OPINION

BARKER, Judge.

¶ 1 We address in this opinion, among other issues, what the term "interruption of business, whether total or partial" means in this contract of insurance.

### *Facts and Procedural History*

#### *1. Tropicana Expansion Project*

¶ 2 At all times relevant to this appeal, Appellant Aztar Corporation ("Aztar"), a Phoenix-based corporation, owned and operated the Tropicana Casino and Resort ("Tropicana") in Atlantic City, New Jersey. In 2002, Aztar began an expansion at a site adjacent to the Tropicana. The twenty-seven story expansion included dining, retail, and entertainment venues on the lower levels, an eight-story parking garage above the lower levels, and seventeen levels of hotel rooms on the top. A walkway and valet bridge would connect the expansion structure to the Tropicana. The expansion was scheduled for completion and the opening of business on April 15, 2004.

¶ 3 While under construction, on October 30, 2003, six floors of the expansion collapsed. It took Aztar until November 30, 2004 to clean up the debris, rebuild the expansion, and open it to the public. The collapse caused a seven-month delay in utilizing the expansion.

¶ 4 Due to the collapse, the New Jersey government temporarily shut down the main entry street to the Tropicana, a pedestrian bridge, the Tropicana's bus terminal, an existing parking structure, and the Tropicana's west hotel tower. The Tropicana itself did not sustain any physical damage from the collapse and remained fully operational aside from the temporary access closures ordered by New Jersey authorities. In the months

following the collapse, the Tropicana experienced a decrease in patronage at the casino and hotel. This resulted in a claimed $105 million loss. Aztar submitted claims to its insurance carriers to cover loss from the collapse and interruption of the Tropicana's business.

### 2. Aztar's Insurance Coverage

¶ 5 Lexington Insurance Company ("Lexington") issued Aztar's primary layer of property insurance. In addition, Aztar purchased second and third layers of excess policies from Appellees U.S. Fire Insurance Company, Westchester Surplus Lines Insurance Company, Essex Insurance Company, Axis Specialty Limited, Hartford Fire Insurance Company, Zurich American Insurance Company, and Certain Underwriters at Lloyd's, London (the "Excess Insurers"). All of the policies, issued by the Excess Insurers, incorporated the terms of the Lexington policy.[1] For this reason, we refer to the language of the Lexington policy (the "Policy"). The expansion was to be endorsed onto the Policy on April 1, 2004.

¶ 6 Part II, ¶ 1 of the Policy provides Aztar with business interruption coverage. Part II, ¶ 2 of the Policy contains seven extensions of coverage including contingent business interruption, impaired ingress/egress, and business interruption due to a government order that impairs access. The relevant provisions of the Policy state:

## PART II

### BUSINESS INTERRUPTION AND EXTRA EXPENSE INCLUDING CONTINGENT BUSINESS INTERRUPTION AND EXPEDITING EXPENSE

1. COVERAGE—This policy insures against loss resulting directly from necessary interruption of business, whether total or partial, caused by damage to or destruction of all real or personal property, manuscripts and watercraft, by the peril(s) insured against, during the term of this policy, on premises situate per the Territorial Limits in this policy.

2. This policy is extended to cover:

. . . .

c. The actual loss sustained by the Insured resulting directly from an interruption of business, and the necessary extra expense incurred by the insured, during the length of time not exceeding thirty (30) consecutive days and subject to a sublimit of $20,000,000 per occurrence, as a direct result of damage to or destruction of property within five (5) miles of the Insured's premises, caused by or resulting from a covered peril(s), access to such described premises is specifically prohibited by order of civil or military authority.

d. The loss sustained during the period of time not exceeding thirty (30) consecutive days and subject to a sublimit of $20,000,000 per occurrence when the Insured's operations would normally have taken place when, as a direct result of damage within five (5) miles of the Insured's premises by a peril insured against, access to or egress from real or personal property of the Insured is impaired.

. . . .

f. Loss resulting from the necessary interruption of business conducted by the Insured, and the necessary extra expense incurred by the Insured, subject to a sublimit of liability of $50,000,000 per occurrence, caused by damage or destruction by a peril not excluded herein occurring during the term of this policy to real or personal property of the Insured's suppliers or customers or of contributing or recipient properties of the Insured.

g. The actual loss sustained by the Insured resulting directly from the interruption of business, as covered by this policy, for such additional length of

---

**1.** We accept, without deciding, Aztar's position that Zurich American Insurance Company agreed to "follow form" to the Lexington policy, i.e. that Zurich American's policy terms did not differ from the Lexington policy. Therefore, we do not address coverage issues as they relate to Zurich American separately.

time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

(1) the date on which the liability of this Company for loss resulting from interruption of business would terminate if this endorsement had not been attached to this policy; or

(2) the date on which repair, replacement or rebuilding of such part of the building(s), structure(s), machinery, equipment, or furniture and fixtures of the property herein described as has been damaged or destroyed is actually completed;

but in no event shall this coverage apply for more than 365 days after the commencement date as defined above. In all other respects, the terms and conditions of this policy remain unchanged and are applicable to this extension coverage.

. . . .

12. RESUMPTION OF OPERATIONS
   It is a condition of this insurance that:

a. Applicable only to loss of earnings, if the insured could reduce the loss,

(1) by complete or partial resumption of operation of the property herein described, whether damaged or not, or

. . . .

Such reduction shall be taken into account in arriving at the amount of loss hereunder;

. . . .

¶ 7 Aztar submitted business interruption claims to Lexington and the Excess Insurers. Lexington accepted the civil authority and ingress and egress claims under Part II, ¶¶ 2.c and 2.d but denied coverage under the claims for business interruption (Part II, ¶ 1) and contingent business interruption (Part II, ¶ 2.f) because the collapse did not close any part of the Tropicana that suffered loss. Similarly, the Excess Insurers denied business interruption and contingent business interruption coverage asserting coverage is only available if the collapse damaged the Tropicana or otherwise caused it to shut down. The Excess Insurers also denied excess coverage of ingress/egress and civil authority claims.

### 3. Procedural History

¶ 8 Aztar sued Lexington and the Excess Insurers to recover loss due to decreased patronage at the casino and hotel under Part II of the Policy. Aztar dismissed Lexington after it paid the $5 million policy limit, $3.5 million of which covered loss from government closure of the bus terminal, main entry street, parking structure, and west hotel tower.

¶ 9 Aztar and the Excess Insurers filed cross-motions for partial summary judgment on several issues, some of which form the basis of this appeal. On April 26, 2007, the trial court denied Aztar's cross-motion for partial summary judgment and granted partial summary judgment in favor of the Excess Insurers. As part of its ruling, the trial court determined "necessary interruption of business, whether total or partial" does not include loss from decreased patronage at the Tropicana hotel and casino because the Tropicana was not damaged by the collapse and remained fully operational. The trial court found an issue of fact regarding whether the expansion was covered by the Policy when it collapsed. This finding, however, did not affect the outcome based on the trial court's conclusion that there was no business interruption. The trial court also held contingent business interruption coverage under Part II, ¶ 2.f was not available because the expansion was not a "contributing" property and loss from decreased patronage was not a business interruption. Finally, the trial court held that the thirty-day indemnity periods in the civil authority and ingress/egress provisions in Part II, ¶¶ 2.c and 2.d are separate extensions of coverage from the 365-day indemnity provision in Part II, ¶ 2.g. The trial court denied Aztar's motion for partial reconsideration.

¶ 10 Essex Insurance Company, Zurich American Insurance Company, Axis Specialty Limited, Hartford Fire Insurance Company, and Certain Underwriters at Lloyds,

London (the "Certain Excess Insurers")[2] filed applications for attorneys' fees and costs in August and September 2007. Aztar objected to each motion. Although the motions were untimely under Arizona Rule of Civil Procedure ("ARCP") 54(g)(2), the trial court summarily overruled Aztar's objections and awarded attorneys' fees and costs to the Certain Excess Insurers when Aztar could not demonstrate how it was prejudiced by the untimely filings.

¶ 11 Aztar timely filed a notice of appeal on June 30, 2008. On appeal, Aztar argues the trial court erred in denying Aztar's cross-motions for summary judgment and in granting summary judgment in favor of the Excess Insurers. Aztar also argues the trial court abused its discretion in awarding attorneys' fees and costs to the Certain Excess Insurers.

¶ 12 We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1), (B) and 12–2101(B) (2003).

### Discussion

#### 1. Business Interruption Claims

¶ 13 Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). We review a grant of summary judgment de novo to decide whether any genuine issues of material fact exist and whether the trial court erred in applying the law. Urias v. PCS Health Sys., Inc., 211 Ariz. 81, 85, ¶ 20, 118 P.3d 29, 33 (App.2005). We review the facts and reasonable inferences in the light most favorable to the party against whom judgment was entered. Prince v. City of Apache Junction, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996).

¶ 14 In this case, the trial judge granted summary judgment in favor of the Excess Insurers because Aztar's operational capacity was not diminished. As we explain in detail below, we reject this reasoning but determine that Aztar nonetheless does not qualify for coverage under the policy terms at issue for other reasons asserted by the Excess Insurers.

#### a. Meaning of "Necessary Interruption of Business, Whether Total or Partial"

¶ 15 Aztar submitted claims to the Excess Insurers for business interruption coverage under Part II, ¶ 1 of the Policy. Part II, ¶ 1 of the Policy states:

This policy insures against loss resulting directly from necessary interruption of business, whether total or partial, caused by damage to or destruction of all real or personal property, manuscripts and watercraft, by the peril(s) insured against, during the term of this policy, on premises situate per the Territorial Limits in this policy.

¶ 16 The disputed issue is whether the Policy covers Aztar's loss of revenue due to decreased patronage at the casino and hotel following the collapse and subsequent delay of the expansion.[3] Aztar contends "interruption of business, whether total or partial" covers loss from decreased patronage, so long as the decreased patronage is brought about by a covered peril. The Excess Insurers argue there is no coverage for decreased patronage and attendant lost revenues because the Tropicana was still able to function

2. As a result of the trial court's ruling on the cross-motions for partial summary judgment, Aztar had some claims disposed of, but some remained against the Excess Insurers in addition to those on appeal. The remaining claims were subsequently settled or dismissed at different times. After the entry of final judgment, U.S. Fire Insurance Company and Westchester Surplus Lines Insurance Company did not seek fees in the trial court. Accordingly, we use the term "Certain Excess Insurers" in this opinion to describe those of the Excess Insurers who were awarded fees below that Aztar contests on appeal.

3. Although Aztar also argues the trial court failed to consider evidence that the collapse caused a direct shutdown of parts of the Tropicana (an existing parking structure, the bus terminal, the main entry street, and the west hotel tower), Aztar received compensation for these temporary closures by Lexington under the civil authority and ingress/egress provisions. New Jersey authorities and impaired access to the Tropicana caused these temporary closures. Therefore, we do not consider these temporary shutdowns under the standard business interruption and contingent business interruption provisions.

---

at full capacity. The trial court agreed with the Excess Insurers. Because we reject the legal proposition that the terms "interruption of business, whether total or partial" cannot ever be construed to include decreased patronage, we agree with Aztar that the trial court erred in entering summary judgment on this ground.

### i.

¶ 17 In construing a contract, we "give words their ordinary, common sense meaning." *A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County*, 220 Ariz. 202, 209, ¶ 23, 204 P.3d 1051, 1058 (App. 2008). Pertinent to the insurance contract here, our supreme court has instructed that "in construing the meaning of an insurance policy, the language used should be viewed from the standpoint of the average layman who is untrained in the law or insurance." *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 537, 647 P.2d 1127, 1135 (1982). "If a clause appears ambiguous, we interpret it by looking to legislative goals, social policy, and the transaction as a whole." *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397, ¶ 8, 187 P.3d 1107, 1110 (2008).

¶ 18 The construction of the clause at issue here is one of first impression in Arizona.[4] The Excess Insurers point us to several cases from other jurisdictions construing business interruption clauses and urge that we follow their holdings that reduced patronage is not covered. *E.g., Ramada Inn Ramogreen, Inc. v. Traveler's Indem. Co. of Am.*, 835 F.2d 812 (11th Cir.1988); *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 596 F.2d 283 (8th Cir.1979). Our first inquiry, however, as the Arizona authorities above direct, is the language of the contract itself. It is to that language we first turn.

### ii.

¶ 19 The critical phrase to be considered is "loss resulting directly from necessary *interruption of business, whether total or partial.*" (Emphasis added.) The Excess Insurers argue "interruption" is most frequently defined as "stoppage" or "cessation," while Aztar points to other dictionary definitions that define the term as "to hinder or stop." For our purposes, we consider a standard, common sense definition to include the following: "1: to stop or hinder by breaking in 2: to break the uniformity or continuity of." Merriam–Webster's Collegiate Dictionary 611 (10th ed.2001). Thus, either party's definition of "interruption" is reasonable in this setting.

¶ 20 The addition of the phrase "total or partial" also makes it plain that any stoppage, or hindrance, need not impact the entire "business" but only a portion. We do not, however, conclude that the use of the term "or partial" can only be given meaning by allowing coverage for reduced patronage. It can be applied, as the Excess Insurers argue, to mean the complete stoppage of a *portion* of an insured's business as contrasted with stoppage of the *entirety* of an insured's business. *Compare Omaha Paper*, 596 F.2d at 289 (finding coverage under "partial suspension of business" provision where a fire partially interrupted insured's process-

---

4. None of the parties assert that there is a choice of law issue in this matter. The Excess Insurers and Aztar have treated this matter as though Arizona law (to the extent there is any) is to be applied to the construction of the insurance contract and all other issues. There is a choice of law provision in the Policy that provides: "This policy shall be construed under the laws of the United States of America whose courts shall have sole jurisdiction hereunder." We consider this provision to essentially be intended in those situations (not present here) that might involve a question of law to which the laws of a foreign nation may apply. Because the parties have treated this matter as arising under Arizona law, and there is a basis to do so, see *Bryant v. Silverman*, 146 Ariz. 41, 44 n. 2, 703 P.2d 1190,

1193 n. 2 (1985) (limiting analysis to issue presented by parties of whether Arizona or Colorado law applied because parties did not argue that New Mexico or Texas law should apply and only analyzing "contacts of New Mexico or Texas when such contacts would favor application of Arizona or Colorado law"), we apply Arizona law. We do not, however, address whether another state's law could have also been applied. *See, e.g.,* Restatement (Second) of Conflict of Laws § 193 (1971). That issue was not presented to us and has been waived. *Childress Buick Co. v. O'Connell*, 198 Ariz. 454, 459, ¶ 29, 11 P.3d 413, 418 (App.2000) ("Our policy, and the policy of most appellate courts, is that issues not clearly raised in appellate briefs are deemed waived.").

ing plant), *with Forestview The Beautiful, Inc. v. All Nation Ins. Co.*, 704 N.W.2d 773, 775–76 (Minn.App.2005) (denying insured coverage for partial interruption of business due to damage from Hurricane Katrina under "necessary suspension" provision when there was no reference to "total or partial").

### iii.

¶ 21 We turn now to the term "business." The construction of this term is critical to our analysis. The trial court considered the term "business" to be the equivalent of "operations" or "use." For example, the trial court stated: "In this Court's opinion, the business interruption provisions in Defendants' policies would only provide coverage if the exiting [sic] hotel and casino were *unable to operate* at their full capacity due to the expansion project collapse. It is undisputed that the expansion project collapse did not prevent the Tropicana's existing hotel and casino from *operating at its full capacity*." (Emphasis added.) To be sure, some other jurisdictions have used that definition. *E.g., Ramogreen*, 835 F.2d at 813–15 (finding that a decline in hotel occupancy due to fire in hotel restaurant was not an "interruption of the insured's business" where hotel rooms were available for use); *Nat'l Children's Expositions Corp. v. Anchor Ins. Co.*, 279 F.2d 428, 430 (2nd Cir.1960) (finding that loss due to decreased attendance at exhibition was not an interruption of business because snowstorm did not make any portion of exhibition building unusable); *Hotel Prop., Ltd. v. Heritage Ins. Co. of Am.*, 456 So.2d 1249, 1250 (Fla.Dist.App.1984) (denying business interruption coverage for decline in hotel room occupancy following fire in hotel restaurant); *Howard Stores Corp. v. Foremost Ins. Co.*, 82 A.D.2d 398, 401–02, 441 N.Y.S.2d 674 (1981) (denying business interruption coverage for lower than projected sales where insured's three stores did not suspend business operations when water damaged one store); *Keetch v. Mut. of Enumclaw Ins. Co.*, 66 Wash.App. 208, 831 P.2d 784, 786–87 (1992) (denying coverage for "interruption of business" for decline in occupancy at motel because falling ash from volcano explosion did not decrease the availability of rooms).

¶ 22 We do not take lightly the holdings based on the law in other states. However, in some of those cases the precise policy language differs from that at issue here. *E.g., New England Gas & Elec. Ass'n v. Ocean Accident & Guarantee Corp.*, 330 Mass. 640, 116 N.E.2d 671, 684 (1953) (referring to a "use and occupancy endorsement" for the "business interruption" coverage). Considering whether the "use" of one's premise has been hindered or stopped may lead to a substantially different analysis than whether one's "business" has been hindered or stopped. Additionally, many of the cases from other jurisdictions refer to the historical roots of "business interruption" insurance as arising out of "use and occupancy" insurance. *Ramogreen*, 835 F.2d at 814 ("[T]he purpose of a business interruption policy is to indemnify the insured 'for loss caused by the interruption of a going business consequent upon the destruction of the building, plant, or parts thereof ... [t]his type of insurance is usually called use and occupancy insurance.' " (citation omitted) ); *Omaha Paper*, 596 F.2d at 288 ("The term 'use and occupancy' is generally used inter changeably with the term 'business interruption.' ").

¶ 23 Some of these cases construed policies that have language that uses the terms "business interruption" and "use and occupancy" interchangeably. *E.g., Omaha Paper*, 596 F.2d at 288 ("both [terms] used somewhat interchangeably in this contract"). In other cases, however, only the term "business interruption" is discussed. *Ramogreen*, 835 F.2d at 813–14 (referencing policy language only referring to "the necessary interruption of insured's business" but treating it as "use and occupancy" insurance). In the policy language before us, however, there is only one reference to the term "use and occupancy." That reference is in Part I of the Policy pertaining to *property* coverage and is not found in Part II of the Policy, which pertains to business interruption coverage. Thus, while we may consider the origin of a particular term, we do not necessarily accept as definitions "commercial customs" that may be employed in the insurance industry, but are not reflected in the language of the policy. We focus on the commonly understood

meanings of the words actually used. As stated in *Sparks,*

> [W]e are not concerned with what the "commercial customs" are in the insurance industry, but rather, what the ordinary person's understanding of the policy would be.... [I]n construing the meaning of an insurance policy, *the language used should be viewed from the standpoint of the average layman who is untrained in the law or insurance.*

132 Ariz. at 537, 647 P.2d at 1135 (emphasis added). Accordingly, we turn to the task of considering what the term "business" means to "the average layman."

¶ 24 In lay terms, there is simply no question that the term "business" is not limited to the "operation" or "ability to use" one's premises, as contrasted with a broader definition that also includes the ability to sell the services available or the goods produced. Indeed, one would not be able to stay in "business" if one's production facility was not impaired, but there was no ability to sell any items produced. The following is a standard definition of "business": "a usu. commercial or mercantile activity engaged in as a means of livelihood." Merriam–Webster's Collegiate Dictionary 154 (10th ed.2001); *see also* The American Heritage Dictionary of the English Language 252 (4th ed.2000) (defining "business" as "[v]olume or amount of commercial trade"). We are not aware of, nor have we been cited to, a common-sense, typical definition of the term "business" that would exclude the ability to *sell* one's products and only include the ability to *produce* products or make available services.

### iv.

¶ 25 Without reference to competing lay definitions, the Excess Insurers point to the case law referenced above arguing we should construe that phrase to mean essentially "use or occupancy" of a premises. We do not believe such a restrictive definition comports with Arizona's requirement that we eschew technical jargon or "commercial customs" that are both unexplained and unincorporated in the terms of the insurance policy itself and in fact contrary to a commonly held view of the term in dispute. *See Sparks,* 132 Ariz.

at 537, 647 P.2d at 1135. As applied to the competing definitions of "business" offered here, a hypothetical helps make the point. *See In re Andrew C.,* 215 Ariz. 366, 370, ¶ 21, 160 P.3d 687, 691 (App.2007) ("Frequently, hypothetical examples shed light on the viability, or lack thereof, of an asserted legal principle.").

¶ 26 Assume that an ice cream store is located in a remote area with no other accessible services. It has become a tourist attraction and tourists come simply to see its production and taste its frozen delicacies. Assume it is comprised of three separate buildings, all of which function at full capacity: Building One is where the ice cream is made and sold. Building Two is where the cows are housed that produce the milk necessary to manufacture the ice cream. Building Three is a parking facility that provides the only place where customers can park to make purchases at the store. Now, assume that one-half of Building Two (housing the cows) burns down, destroying one-half of the cows. The ice cream store has to cut its production in half. The store turns away one-half of its customers (as there is insufficient ice cream) with a concomitant loss of one-half of its income. Under the Excess Insurers' position, this loss would be covered because the ability to *produce* the ice cream and use the manufacturing aspect of the business has been reduced. On this theory, "operation" or "use" of the production facility was cut, meaning that "business" was interrupted.

¶ 27 Assume, however, that the same fire takes place at Building Three (the parking facility) instead of Building Two (housing the cows). One-half of the parking facility is destroyed and the number of parking places is cut in half. The business now turns away one-half of its customers (as there are insufficient places to park) with a concomitant loss of one-half of its income. Under the Excess Insurers' position, this loss would *not* be covered because the ice cream store still had the ability to *produce* the same amount of ice cream; the operation side of the business is still intact. From the lay person's perspective, however, and from ours, the "business" has still experienced the same one-half loss

in income, regardless whether the damage was to the facility pertaining to the supply side of the business (the cows in Building Two) or to the facility pertaining to the demand side of the business (the parking places in Building Three). If the hypothetical ice cream store is able to prove its loss, and satisfy the other policy requirements, it would be entitled to recover from the insurer under these policy terms.

### v.

¶ 28 Our conclusion that the term "business" has a meaning broader than "use of premise" is consistent with what is widely considered to be the seminal case on business interruption insurance, *Studley Box & Lumber Co. v. National Insurance Co.*, 85 N.H. 96, 154 A. 337 (1931). In *Studley*, the insured operated a "shook factory." [5] *Id.* at 338. The factory had several structures including a saw mill and a barn. *Id.* The terms of the policy provided coverage based on "damage[ ] by fire ... so as to necessitate a total or partial suspension of business." *Id.* at 337. The insured's business was partially interrupted after a fire burned the barn and some of the horses inside that were used to operate the insured's saw mill. *Id.* at 338–39.

¶ 29 Although the saw mill was in a different physical location than the barn where the fire occurred, the insured could not produce as much lumber as before the fire because there were fewer horses to aid in the sawing process. *Id.* at 338. In granting business interruption coverage, the court stated:

> The *business being conducted as a whole*, a fire loss on any of the units of the plant affects the business in its entirety and not merely the particular part of it carried on in such unit. *The units are mutually dependent, and, if one fails, the others ordinarily suffer.*

*Id.* (emphasis added). Though *Studley* applied to a property that affected the supply side, the principle *Studley* announced was equally applicable to destruction of a facility specifically intended to promote the demand side. Thus, *Studley* announced mutual dependency as a guiding principle in construing a business interruption clause. The court went on to state:

> Without evidence to the contrary, the object of the policies is clear to insure against loss from the interruption of the business as a whole, whatever part of it may be conducted in or with the property which suffers from the fire. While loss of a certain kind by fire is insured against, the nature of the loss is such that it is not important in this respect what part of the property sustains loss.

*Id.* (emphasis added).

¶ 30 In our hypothetical ice cream store, Buildings One, Two, and Three were mutually dependent upon each other. Following the principle announced in *Studley*, coverage should be provided regardless whether the damage was on the supply side (Building Two—housing the cows) or on the demand-related side (Building Three—parking for customers' cars).[6] Of course, utilizing our hypothetical example, the collapse of Aztar's expansion is asserted to have had a similar impact on Aztar as the damage to the parking facility had to the ice cream store. Following this principle, "business" has been interrupted and the loss would fall within that term.

¶ 31 Other courts, however, have focused on the fact that the property damaged in *Studley* was the barn and horses that were used in production of the goods. Accordingly, those courts have limited the application of the principle of mutual dependency to the

---

5. A "shook" is a "set of staves and headings for one hogshead, cask, or barrel." Merriam–Webster's Collegiate Dictionary 1080 (10th ed.2001).

6. Another hypothetical example that illustrates the point is as follows. Assume an enterprise spent substantial amounts of money building on-site signage to attract customers to its premises to purchase goods. The business can document the increase in customers, and accordingly, its "business" has significantly increased its income as a result of the signage it has constructed. Assume also that a covered peril destroys the signage. Although the production facility itself has not been impacted, the insured should nonetheless be entitled to coverage if the policy provides for interruption of its "business" as set forth here.

*operation* of a facility. *Omaha Paper*, 596 F.2d at 288; *Ramogreen*, 835 F.2d at 814.

¶ 32 For example, in *Ramogreen*, fire damage caused permanent closure of a separately insured restaurant located at the insured's hotel property. 835 F.2d at 813–14. The fire caused no damage to the hotel, and all rooms were available for use. *Id.* The policy at issue insured "against loss of earnings resulting directly from the necessary interruption of the insured's business" caused by a covered peril. *Id.* at 813. The case is factually similar to the one presented here. The insured filed a business interruption claim to cover loss incurred from the decline in hotel room occupancy resulting from the restaurant closure. *Id.* The insured claimed it was entitled to recover losses under the business interruption clause "for the decline in occupancy of the hotel facility that resulted from the closing of the restaurant." *Id.* The court, however, found there was no mutual dependency between the restaurant and the hotel because the fire did not reduce hotel *operations*. *Id.* at 814. The court relied upon *Studley*, stating:

> Without the horses, the lumber plant was forced to suspend a portion of its operation. This is not the situation in the instant case where the *hotel operation was able to accommodate the same number of patrons, albeit their actual number of customers may have been reduced.*

*Id.* (emphasis added).

¶ 33 From our perspective, the concept of "mutual dependency" applies whether or not the structure that is damaged relates to producing the goods or services or providing the ability for customers to *purchase* the goods or services. For instance, assume in *Studley* it had not been the barn and the horses that produced the lumber that were damaged, but a different structure where customers tied and fed their horses necessary to make the trip back. If the destruction of this hypo-

thetical structure had the same financial impact on the business, we doubt that the *Studley* court would have reached a contrary conclusion. Under either scenario, the shook factory would be unable to sell its wares. The principle of mutual dependency prevails. The fact that in one scenario the factory is still able to operate and produce its goods, but not *sell* them, is irrelevant as the "business [was] *being conducted as a whole … [t]he units are mutually dependent,* and, if one fails, the others ordinarily suffer." *Studley*, 154 A. at 338. Thus, we disagree with the limiting interpretation that *Ramogreen* and related cases [7] have given to *Studley*, and which the trial court applied.

*vi.*

¶ 34 The Excess Insurers also argue that the resumption of operations provision in Part II, ¶ 12 of the Policy implies that a business interruption must fully or partially suspend the insured's operations. Paragraph 12 places a duty on Aztar to mitigate loss from an interruption of business by completely or partially resuming business. The Excess Insurers contend Aztar cannot resume operations to mitigate loss from decreased patronage at a fully operational business. On the contrary, when the parking facility was damaged in our hypothetical ice cream store, the business suffered a one-half loss of income. By repairing the parking facility, the ice cream store owner acts to mitigate the loss. The decrease in patronage was directly tied to a damaged facility. Aztar essentially asserts that the collapse of the expansion project, had it been completed, had the same impact on its facilities as the parking garage in the ice cream store hypothetical, a reduction in patronage. Aztar mitigates its loss, the argument goes, and complies with ¶ 12 by repairing the collapsed parking structure. The fact that its other facilities remained operational does not con-

---

7. Aztar also cites to unreported memorandum decisions from federal district courts in support of its argument. We do not address or refer to these cases. *See* ARCAP 28(c); *Kriz v. Buckeye Petroleum Co., Inc.*, 145 Ariz. 374, 377 n. 3, 701 P.2d 1182, 1185 n. 3 (1985) (Arizona Rule of Civil Appellate Procedure ("ARCAP") 28(c) prohibits citation to unpublished federal as well as

state court decisions). The case law interpreting ARCAP 28(c) can leave some room for confusion. ARCAP 28(c) prohibits citation to "[unpublished] memorandum decisions from any court." *Walden Books Co. v. Dep't of Revenue*, 198 Ariz. 584, 589, ¶ 23, 12 P.3d 809, 814 (App.2000); *see also Hourani v. Benson Hosp.*, 211 Ariz. 427, ¶ 27, 122 P.3d 6, 14 (App.2005).

trol the outcome nor mean that its "business" has not been interrupted.

### vii.

¶ 35 To conclude on this point, for the reasons set forth above, we hold that the trial court erred in determining as a matter of law that Aztar's claims could not fall within the business interruption coverage provided in Part II, ¶ 1 of the Policy because the hotel and casino still had the same operational capacity. That clause is not only "reasonably susceptible" to a construction not limited solely to "operations," but is best understood by the layman in the fashion described herein. Because the trial court based its entry of summary judgment on a flawed definition of "interruption of business," the ruling cannot stand on that theory. We can, of course, affirm an entry of summary judgment for areas on other than that relied upon by the trial judge. *Ness v. W. Sec. Life Ins. Co.*, 174 Ariz. 497, 502, 851 P.2d 122, 127 (App.1992) ("We may uphold a judgment on grounds different from those cited by the trial court."). Such is the case here. While the clause at issue *can* be construed broadly enough to include a decreased patronage claim in some circumstances (i.e., the ice cream store example we have given), that does not mean that any and all decreased patronage claims are included or that Aztar's is one that is. Courts must consider the nature of the loss in determining whether the claim falls within the definition of business.

¶ 36 In the ice cream store example, we assumed the loss was caused by damage to property both covered by the policy and functioning at the time of the fire. Here, Aztar seeks coverage for two types of loss. First, Aztar requests coverage for contingent business interruption loss—a decrease in *anticipated* patronage from new customers who would have stayed at or visited the expansion and then patronized the hotel and casino. Aztar asserts the contingent business interruption loss occurred during the approximate seven-month delay in the opening of the expansion. Second, Aztar claims coverage for loss from decrease in *existing* patronage by those who stayed away from the Tropicana due to psychological factors (i.e., fears be-

cause of the loss of life and collapse of the expansion). We now address whether Aztar's losses are equivalent to the functioning parking garage that was a covered loss in our hypothetical.

### b. Contingent Business Interruption Loss

¶ 37 As noted, Aztar seeks to recover loss from decreased anticipated patronage under the Policy's contingent business interruption provision. Aztar refers to this loss as a contingent business interruption loss, which was caused by unrealized anticipated profits at the hotel and casino by new customers who would have visited the expansion and then patronized the existing Tropicana, had the expansion been completed. Coverage for this type of loss turns on the meaning of the contingent business interruption provision. Part II, ¶ 2.f of the Policy states:

> *Loss resulting from the necessary interruption of business* conducted by the Insured, and the necessary extra expense incurred by the Insured, subject to a sublimit of liability of $50,000,000 per occurrence, *caused by damage* or destruction by a peril not excluded herein occurring during the term of this policy to real or personal property of the Insured's suppliers or customers or *of contributing* or recipient *properties of the Insured.*

(Emphasis added.)

¶ 38 Aztar argues ¶ 2.f provides coverage for decreased patronage because the expansion was a "contributing propert[y]" that added customers to the casino and hotel. The Excess Insurers argue that Aztar cites no case holding that "property damage[ ] in the course of construction and prior to opening triggers contingent [business interruption] coverage for anticipated future contributions of the insured property." The trial court granted the Excess Insurers' motion for the reason that there was no business interruption and because the expansion was not "contributing" property. We find merit in the trial court's latter reason for denying contingent business interruption coverage.

¶ 39 As we have discussed previously, we look at an insurance contract from the perspective of an average layman and give

words their common and ordinary meaning. *Sparks,* 132 Ariz. at 537, 647 P.2d at 1135; *Chandler Med. Bldg. Partners v. Chandler Dental Group,* 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993). The Oxford English Dictionary defines "contribute" as "to have a part or share in producing" and "[t]o give or furnish along with others towards bringing about a result." The Oxford English Dictionary 848–49 (2nd ed.2000). Merriam–Webster's Collegiate Dictionary says "contribute" means "to play a significant part in bringing about an end or result." Merriam–Webster's Collegiate Dictionary 252 (10th ed.2001). In the Policy, "contributing" is an adjective modifying and defining the "properties" in relation to the Insured's business. In this context, the ordinary meaning of "contributing property" is that the property is *presently* in operation or production and adding to the Insured's business when the loss occurs.

¶ 40 Here, the expansion collapsed before it was completed and opened for business. Returning to our earlier analogy, the collapsed expansion in this case was never completed and was not "contributing" as was the parking facility in our ice cream store example. As the Excess Insurers argue, there was no "property" that was contributing to the Tropicana. Aztar presented evidence that, before the collapse, the expansion resulted in improved bookings and additional customers seeking "comps" when the expansion would open. However, "contributing property" does not mean the prospect that the property will be complete and contribute to the Insured's business in the future. In such a case, the property itself is not contributing; only the *prospect* of its successful completion is contributing. If the rule were otherwise, fanciful and speculative announcements of future business enhancements used to generate consumer interest could be covered as "contributing property," and we do not view the ordinary meaning of the term so broadly. Accordingly, the trial court did not err in granting summary judgment on the issue of contingent business interruption coverage under Part II, ¶ 2.f.

¶ 41 Aztar also argues that recovery for this same decrease in anticipated patronage for contingent business interruption loss is permitted under Part II, ¶ 1, the primary main business interruption clause. This argument is misplaced. Part II, ¶ 1 is a broad provision relating to business interruption loss in general, whereas Part II, ¶ 2.f is a more specific provision extending coverage to business interruption loss, with a $50,000,000 sublimit of liability, caused by damage to the Insured's contributing property. In describing the coverage in ¶ 2.f, as contrasted with ¶ 1, the policy states it "is *extended* to cover" the circumstances in Part II, ¶ 2.f. (Emphasis added.) As we discuss in more detail below, *infra* ¶¶ 46–48, this language directs that the coverage provided in Part II, ¶ 2.f would be for circumstances in addition to, but not covered in, Part II, ¶ 1. Aztar's construction turns that language on its head. Under Aztar's construction, Part II, ¶ 1 would provide coverage when the more specific conditions set forth in Part II, ¶ 2.f, intended to "extend" coverage, act to *preclude* coverage. Such a construction puts Part II, ¶ 1 and Part II ¶ 2.f at odds with each other. When interpreting an insurance contract, we have a duty to "harmonize all parts of the contract ... by a reasonable interpretation in view of the entire instrument." *Brisco v. Meritplan Ins. Co.,* 132 Ariz. 72, 75, 643 P.2d 1042, 1045 (App.1982); *see also LeBaron v. Crismon,* 100 Ariz. 206, 209, 412 P.2d 705, 707 (1966). Importantly, the "specific provisions of a contract qualify the meaning of a general provision." *Technical Equities Corp. v. Coachman Real Estate Inv. Corp.,* 145 Ariz. 305, 306, 701 P.2d 13, 14 (App.1985); *see also Norman v. Recreation Ctrs. of Sun City, Inc.,* 156 Ariz. 425, 428, 752 P.2d 514, 517 (App.1988). Consequently, Aztar cannot recover its asserted losses for a decrease in anticipated patronage under Part II, ¶ 1 because Part II, ¶ 2 is more specific and does not provide coverage.

*c.* **Loss From Decreased Existing Patronage Due to Psychological Factors**

¶ 42 Aztar seeks coverage under Part II, ¶ 1 for its loss from an asserted decrease in existing patronage at the Tropicana due to psychological factors. The Excess Insurers argue the expansion must be covered property under the Policy for this

claim to trigger coverage. Aztar argues that there is no such requirement. The trial court did not directly reach this issue. Rather it found an issue of fact existed as to whether the expansion was covered property on the date of the collapse. This factual finding was erroneous.[8]

### i.

▮ ¶ 43 The trial court's factual finding (that there was a question of fact as to whether the expansion was covered) implies a ruling on the law that business interruption coverage under Part II, ¶ 1 is available only if damage to or destruction of *covered* property causes the interruption of business. Though we find error in the factual finding, we agree with the implicit ruling that the damaged property must be covered to trigger the policy provision.

¶ 44 Part II, ¶ 1 of the Policy provides business interruption coverage for "loss ... caused by damage to or destruction of all real or personal property, manuscripts and watercraft, by the peril(s) insured against, during the term of this policy, on premises situate per the Territorial Limits in this policy." Aztar argues that the language of the business interruption provision does not require damage to or destruction of "covered property"; it instead requires damage to "all real or personal property." The Excess Insurers argued to the trial court that "real or personal property" refers to the property covered under Part I, ¶ 1 of the Policy. Part I, ¶ 1 states:

**Property Covered**—This policy covers:

a. The interest of the Insured for all real and personal property including, manuscripts, signs, pools, fences, retaining walls, underground tanks and piping, trees considered part of landscaping not excluded as standing timber, shrubs and landscaping owned in whole or in part by the Insured.

▮ ¶ 45 As before, we begin by looking at the language of the policy provisions at issue from the standpoint of an average layman, giving the words their ordinary and common meaning. *Sparks,* 132 Ariz. at 537, 647 P.2d at 1135; *Chandler Med. Bldg. Partners,* 175 Ariz. at 277, 855 P.2d at 791. We interpret a contract "so that every part is given effect, and each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing." *Chandler Med. Bldg. Partners,* 175 Ariz. at 277, 855 P.2d at 791. Our reading of one provision of a contract must not render a related provision meaningless. *Tucker v. Byler,* 27 Ariz.App. 704, 707, 558 P.2d 732, 735 (1976).

¶ 46 Although Part II, ¶ 1 does not explicitly state the property must be "covered," applying these standard rules of contract interpretation, we are persuaded that "all real or personal property" is shorthand for covered property under Part I because a contrary interpretation would result in an absurd contract and make the extensions of coverage in Part II, ¶ 2 meaningless. As noted earlier, Part II, ¶ 2 says "[t]his policy is extended to cover" and then identifies eight extensions of coverage. The plain meaning of "extend" is "to increase the scope, meaning, or application of." Merriam–Webster's Collegiate Dictionary 410 (10th ed.2001). Thus, the extensions of coverage provide additional coverage for situations that are not covered under Part II, ¶ 1.

¶ 47 Aztar's interpretation eliminates the distinction between Part II, ¶ 1 and Part II, ¶ 2. For example, Part II, ¶ 2.f covers "damage or destruction ... to real or personal property of the Insured's suppliers or customers." Under Aztar's interpretation of the Policy, Part II, ¶ 1 would provide business interruption coverage up to the policy limit caused by destruction of a non-covered property in another state that the Tropicana does

---

**8.** Aztar did not raise the covered property issue on appeal. The Excess Insurers did not file a cross-appeal but raised the covered property issue in their answering brief. ARCAP 13(b)(3) provides that "[t]he brief of the appellee may, without need for a cross-appeal, include in the statement of issues presented for review and in the argument any issue properly presented in the superior court." The Excess Insurers properly presented the covered property issue in their cross-motion for summary judgment. Therefore, we may consider the issue on appeal. Our resolution of the case is proper because we have not "enlarge[d] the rights of the appellee or[] lessen[ed] the rights of the appellant." ARCAP 13(b)(3).

not depend on for supplies or customers. However, if the Tropicana heavily depended on this same property for supplies or customers, then Aztar would only recover up to the $50 million limit under ¶ 2.f. Aztar's interpretation makes ¶ 2.f and the remaining extensions of coverage narrow limitations to coverage instead of extensions of coverage. This conflicts with the plain meaning of "extend."

¶ 48 Coverage for interruption of business because of damage to or destruction of any real or personal property located anywhere in the United States is an absurd and unreasonable interpretation of the contract. Numerous examples of the overbreadth of such an interpretation could be given.[9] "It is the duty of the court to adopt a construction of a contract which will harmonize all of its parts, and apparently conflicting parts must be reconciled, if possible, by any reasonable interpretation." *U.S. Insulation, Inc. v. Hilro Constr. Co.*, 146 Ariz. 250, 259, 705 P.2d 490, 499 (App.1985). The only non-absurd reading of the contract is that "all real or personal property" refers back to the policy provisions including Part I, ¶ 1,[10] defining the property that is covered.[11] Thus, we agree with the implicit ruling of the trial court.

#### ii.

¶ 49 The trial court erred when it found a factual issue existed regarding whether the expansion was covered property. The Policy endorsement states:

**ATLANTIC CITY, NEW JERSEY—EXPANSION PROJECT ENDORSEMENT**

It is agreed that Aztar/Tropicana—Atlantic City, New Jersey New Expansion Project (27 story, multi-use: retail, dining, entertainment, meeting rooms, hotel and garage), estimated values of $250,000,000, will be endorsed onto this policy, effective 01 April 2004, without any additional premium.

¶ 50 Aztar argued to the trial court that the expansion was covered property throughout its construction and that April 1, 2004 refers to the date the estimated value of the expansion would be added to the Policy. Aztar also argued that extrinsic evidence shows it purchased coverage for loss caused by the expansion. In particular, Aztar pointed to deposition testimony that its risk manager and insurance broker intended the expansion to be covered under the Policy.

¶ 51 When presented with extrinsic evidence, as is the case here, the "judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993). If "the asserted interpretation is unreasonable or the offered evidence is not persuasive," then the judge bars ad-

9. For example, suppose a fire destroys the floor of the New York Stock Exchange and forces a significant restriction on trading for weeks. This causes chaos among businesses and individual consumers who can no longer easily access money they have invested in the market. In turn, the Tropicana experiences a decrease in patronage by these consumers. Under Aztar's reasoning, the Policy covers its business interruption claim for loss caused by destruction of the New York Stock Exchange.

10. Because Part I as a whole defines covered property, every provision of Part I must be considered in determining coverage issues under Part II, ¶ 1.

11. Aztar argues Part II, ¶ 1 cannot require covered property because it would make ¶¶ 2.i and 2.j of the general conditions redundant. Those provisions are as follows:

i. Loss directly caused by and resulting from dampness of atmosphere, dryness of atmosphere, extremes or changes of temperature (but this exclusion shall not apply to the breakage, bursting, or leakage of pipes and water systems due to freezing), shrinkage, evaporation, loss of weight, rust or corrosion, contamination, or change in flavor, color, texture, or finish, unless such loss is caused by or results from physical damage by a peril not otherwise excluded;
   (1) To the property covered,
   (2) To premises, or
   (3) To conveyances containing such property.
j. Loss or damage by any peril otherwise insured herein to offshore property as herein defined, except as situated in or around Caruthersville, Missouri, and Evansville, Indiana.
We fail to see these provisions as being inconsistent with the analysis set forth above.

mission of the extrinsic evidence. *Id.* at 155, 854 P.2d at 1141.

¶ 52 We disagree with Aztar's interpretation of the endorsement. The language clearly indicates the expansion would be endorsed onto the Policy—and consequently become covered property—on April 1, 2004. What logically follows from this endorsement is that it was *not* covered property before April 1, 2004.[12] Pursuant to *Taylor*, the parol evidence rule bars admission of extrinsic evidence that varies or contradicts the terms of a written contract. *Id.* at 154, 854 P.2d at 1140. Here, Aztar's extrinsic evidence violates the parol evidence rule because it contradicts the plain meaning of the endorsement. The language is not "reasonably susceptible" to the interpretation Aztar proposes. Therefore, this evidence is inadmissible.

¶ 53 Even if the endorsement language was unclear, Aztar acknowledged that the expansion was not covered property in a May 2005 email. In the email, Aztar's broker stated it should have requested a premium refund from Lexington because Lexington had no exposure for the expansion from April 1, 2004 until the expansion was actually endorsed onto the policy on November 23, 2004. No reasonable jury could conclude that "effective 01 April 2004" meant the expansion was covered under the Policy some six months earlier on October 30, 2003. Therefore, we reverse the trial court's ruling on this issue.

¶ 54 Because the expansion was not covered property on the date of the collapse, Aztar's claim based on a decrease in existing patronage under Part II, ¶ 1 is not a covered loss. Consequently, the trial court did not err in granting summary judgment in favor of the Excess Insurers on this claim under the main business interruption provision. *Ness*, 174 Ariz. at 502, 851 P.2d at 127 (affirming summary judgment on grounds different than those referenced by the trial court).

---

12. We are aware that the provisions of the Policy pertaining to "property covered" include "[t]he interest of the Insured for all real and personal property...." However, the specific language of the endorsement directly addressing, and providing for a coverage date of April 1, 2004, effectively clarifies that the expansion is not included until that time.

### d. Civil Authority, Ingress/Egress, and Extended Period of Indemnity Provisions

¶ 55 Part II, ¶¶ 2.c and 2.d of the Policy provide thirty days of extended coverage for loss sustained when damage to property within five miles of the insured's property causes (1) impaired access to or egress from insured's property or (2) an order by civil authority that impairs access to the insured's property. In granting summary judgment in favor of the Excess Insurers, the trial court determined ¶¶ 2.c and 2.d are separate extensions of coverage from Part II, ¶ 2.g, which provides 365 days of extended indemnity coverage for restoration of the insured's business. Aztar argues the trial court erred because ¶ 2.g applies to civil authority and ingress/egress claims. More specifically, Aztar argues civil authority and ingress/egress claims fall within ¶ 2.g because it is "the date on which the liability of this Company for loss resulting from interruption of business would terminate if this endorsement had not been attached to this policy."

¶ 56 Aztar's interpretation would render the thirty-day indemnity limit in ¶¶ 2.c and 2.d meaningless because there would be no thirty-day limit if ¶ 2.g applied. If we adopted Aztar's interpretation, the separately stated time periods would become 395 days, rather than 30. It is a cardinal rule of contract interpretation that we do not construe one term of a contract to essentially render meaningless another term. *Scholten v. Blackhawk Partners*, 184 Ariz. 326, 329, 909 P.2d 393, 396 (App.1995) ("[A] contract should be construed to give effect to all its provisions and to prevent any of the provisions from being rendered meaningless."); *Norman*, 156 Ariz. at 428, 752 P.2d at 517 ("[W]e do not construe one provision in a contract so as to render another provision meaningless."). The 365–day extended indemnity period under ¶ 2.g does not apply to civil authority and ingress/egress claims; the 30–day limit applies.

¶ 57 Although Aztar relies on *Fountain Powerboat Industries, Inc. v. Reliance Insurance Co.*, 119 F.Supp.2d 552 (E.D.N.C. 2000), that case is inapposite to the language in Aztar's Policy. In *Fountain Powerboat*, the court held the one-year extended indemnity provision covered loss sustained from impaired ingress and egress. *Id.* at 557–58. Unlike Aztar's policy that contains a maximum indemnity period for impaired access and civil authority closures, the policy at issue in *Fountain Powerboat* covered loss for the "period of time" access was impaired. *Id.* at 556. Here, we decline to use ¶ 2.g to expand the thirty-day maximum indemnity period for civil authority and ingress/egress claims. Summary judgment in favor of the Excess Insurers was appropriate.

### 2. Attorneys' Fees

¶ 58 Aztar argues the Certain Excess Insurers' applications for attorneys' fees were untimely under ARCP 54(g)(2) because the Certain Excess Insurers failed to file them within twenty days. Aztar also contends that the trial court applied an incorrect standard when it required Aztar to demonstrate that the Certain Excess Insurers' untimely applications prejudiced Aztar. Aztar further claims that under ARCP 54(g), the Certain Excess Insurers were required to request an extension prior to the twenty-day filing deadline.

¶ 59 The Certain Excess Insurers admit their fee applications were filed "approximately one and one-half months after the court's minute entry" but argue the court had discretion to grant them. The Certain Excess Insurers further contend that the court's ruling "concurrently extended the time for [Certain Excess] Insurers to file their application [and] overruled Aztar's objections as to the timeliness of the application."

¶ 60 Interpretation of a rule of civil procedure is subject to *de novo* review. *King v. Titsworth*, 221 Ariz. 597, 598, ¶ 8, 212 P.3d 935, 936 (App.2009). ARCP 54(g)(2) provides:

> Time of Determination. When attorneys' fees are claimed, the determination as to the claimed attorneys' fees shall be made after a decision on the merits of the cause. The motion for attorneys' fees *shall be filed within 20 days* from the clerk's mailing of a decision on the merits of the cause, *unless extended by the trial court.*

(Emphasis added.) ARCP 54(g)(2) gives the trial court discretion to extend the time for requesting attorneys' fees, and the party seeking the fees need not request an extension prior to untimely filing its claim. *Nat'l Broker Assoc., Inc. v. Marlyn Nutraceuticals, Inc.*, 211 Ariz. 210, 218, ¶ 38, 119 P.3d 477, 485 (App.2005). In *National Broker Associates*, we addressed an objection to a claim for attorneys' fees filed after the twenty-day limit. *Id.* We concluded that under ARCP 54(g), "the trial court has the discretion to extend the time for filing the claims." *Id.* Here, the trial court properly granted attorneys' fees in favor of the Certain Excess Insurers.

¶ 61 Aztar points us to *Allstate Insurance Co. v. Universal Underwriters, Inc.*, 199 Ariz. 261, 17 P.3d 106 (App.2000). There, seemingly in conflict with our subsequent ruling in *National Broker Associates*, we stated that when the parties seeking fees did not timely obtain leave to file the motion after the sixty-day filing period, the request for attorneys' fees was untimely. *Id.* at 266, ¶ 16, 17 P.3d at 111. Although we decided that the fee request was untimely, we reversed the award of fees based on a determination that the court no longer had jurisdiction. *Id.* at 265–66, ¶¶ 14–15, 17 P.3d at 110–11. Further, there is no indication in *Universal Underwriters* that the trial court was expressly aware of the untimely filing and determined that it was appropriate to award fees in spite of it. In the matter before us, the trial court expressly found:

> [Certain Excess Insurers] did not submit their fee application within 20 days of the mailing of the decision on the merits. However, Aztar has failed to establish how [the Certain Excess Insurers'] failure in this regard prejudiced Aztar in any way or delayed in any way the entry of judgment in this matter. Thus, the Court is of the opinion that under the facts and circumstances of this case, [Certain Excess Insurers'] failure to comply with Rule 54(g),

Ariz.R.Civ.P., standing alone, does not warrant the denial of their fee application. Therefore, we consider *National Broker Associates* the controlling authority.[13]

¶ 62 We recognize that some federal courts construe the language of Federal Rule of Civil Procedure ("FRCP") 54(d)(2)(B)(i),[14] the similar but not identical federal counterpart to ARCP 54(g), as requiring strict adherence to the filing deadline when no statute or court order provides a different deadline. *See, e.g., Bender v. Freed,* 436 F.3d 747, 750 (7th Cir.2006) (upholding denial of motion for fees as untimely); *IPXL Holdings, L.L.C. v. Amazon.com, Inc.,* 430 F.3d 1377, 1385–86 (Fed.Cir.2005) (finding the district court does not have discretion to extend the fourteen-day filing deadline when the party seeking attorneys' fees did not request an extension pursuant to FRCP 6(b) ). Here, under ARCP 54(g), where no prejudice exists, we believe that *National Broker Associates* provides the better rule in determining that it is not an abuse of discretion for the trial court to grant untimely applications for attorneys' fees.

### Conclusion

¶ 63 For the reasons stated above, we affirm the trial court's denial of Aztar's cross-motion for partial summary judgment and grant of partial summary judgment in favor of the Excess Insurers. We also affirm the trial court's award of attorneys' fees and costs. In the exercise of our discretion, we decline the Excess Insurers' request for attorneys' fees on appeal.

CONCURRING: MAURICE PORTLEY, Presiding Judge and PETER B. SWANN, Judge.

**13.** Our analysis in this regard is limited to Rule 54(g)(2). We do not render a standard of general applicability that impacts our other decisions as to the timeliness of filings under different court rules. *E.g., Maule v. Superior Court,* 142 Ariz. 512, 515, 690 P.2d 813, 816 (App.1984) (holding that under Arizona Rule of Criminal Procedure 12.9, pertaining to the timeliness of a motion to remand a matter to the grand jury, "the trial court has no authority to grant an extension that is not made" within the 25 days provided in that rule).

**14.** "Unless a statute or a court order provides otherwise, the motion must ... be filed no later than 14 days after the entry of judgment." Fed. R. Civ. Proc. 54(d)(2)(B)(i).